In the Matter of ANITA "PP"[1] et al., Children Alleged to be Permanently Neglected. OTSEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Respondent; WERNER "PP",[1] Appellant.

Third Department, December 7, 1978

---

1. Fictitious names used for purpose of publication.

*James E. Barnes, II,* for appellant.

*Edward J. Trosset, Assistant County Attorney,* for respondent.

*Chester Winslow, Law Guardian.*

### OPINION OF THE COURT

*Per Curiam.*

Appellant, Werner "PP", immigrated to this country from Germany in 1960 and married Bonnie Monroe in 1964. Two children were born to the marriage, Anita, 12, and Robert, 10. In 1970, the mother abandoned the family, and appellant, unable to properly care for the children, voluntarily surrendered them to the Orange County Department of Social Services for foster care.

In December of 1971, appellant moved to Otsego County, where he had obtained employment as a baker for which he was trained. His children were reunited with him in April of

1972. However, when the woman with whom appellant was then living departed from his household, appellant again was required to place his children in foster care, this time with the Otsego County Department of Social Services (Agency). In August of 1973, when appellant was transferred to his employer's Oneida store, he requested that the Agency transfer his children to the Oneida County Department of Social Services. His application was rejected. Similarly, the Agency turned down appellant's request to have his children with him for a couple of weeks during the summer of 1975.

The foster care status of appellant's children was reviewed in August of 1976, pursuant to section 392 of the Social Services Law. Although the Agency requested that the children's foster care be continued, the Family Court directed it to initiate a permanent neglect proceeding against appellant and his divorced wife. The wife consented to termination of her parental rights to the children, but appellant vigorously contested the action.

At the fact-finding hearing the testimony revealed that the Agency was fully aware of appellant's difficulties which prevented the return of his children: heavy financial burdens; irregular and lengthy working hours; and absence at home of proper care for the children while he worked. Appellant testified that he intended to consummate his plan of regaining the custody of his children by shortly marrying his girlfriend and thereby establish a home for his children. The Family Court, however, in its decision dated July 12, 1977, stated that it did not "believe that he ever is going to marry her", and that he has no "definite plan to regain custody of his children" now. The court also concluded that the Agency "attempted to encourage and strengthen the parental relationship to begin with, but in recent months it would have been detrimental to the best interests of the children if they attempted to do that any longer". At the dispositional hearing held in August of 1977, appellant testified that he had in fact married on July 29, 1977 and was now in a position to retake his children. Nevertheless, the court stated that "you [appellant] don't mean what you say", and that it was "[t]oo bad" that he had not done this earlier. The court, finding that the children were permanently neglected, terminated appellant's parental rights.

▮ Section 384-b of the Social Services Law enables autho-

rized agencies to initiate permanent neglect proceedings which can result in terminating parental rights, thus making a child available for adoption. A "permanently neglected child" is defined as one who is in the care of an authorized agency and whose parent has failed for more than one year to substantially maintain contact with the child or plan for its future "notwithstanding the agency's *diligent efforts* to encourage and strengthen the parental relationship when such efforts will not be detrimental to the best interests of the child" (Social Services Law, § 384-b, subd 7, par [a]; emphasis added). The statute clearly provides that the parent's failure to maintain contact with the child or plan for his future must occur in spite of the agency's diligent efforts to strengthen the parental relationship when such efforts are not detrimental to the best interests of the child (see *Matter of Ray A. M.,* 37 NY2d 619, 623). The petitions do not allege, nor does the testimony adduced at the fact-finding hearing indicate, that diligent efforts by the Agency to promote the parental relationship could be dispensed with because such efforts would have been detrimental to the best interests of appellant's children as specified in 18 NYCRR 431.9 [b] [2]. (See, also, *Matter of Denlow,* 87 Misc 2d 410, 420.) Thus, the Family Court's conclusion that it would have been "detrimental to the best interests of the children" if the Agency now attempted to encourage the parental relationship is unsupported by the record.

Appellant contends, *inter alia,* that the Agency did not sustain its burden of proving that it made diligent efforts to strengthen and encourage the parental relationship.

█ In a proceeding constituting one of the most severe intrusions by the State into an individual's life—the *permanent* termination of his parental rights—the allegations in the petitions and the proof adduced at the *fact-finding* hearing should carefully adhere to the statutory requirements. Yet the allegations of the petitions are conclusory; they neither specify nor detail what efforts, if any, were undertaken by the petitioner to "encourage and strengthen the parental relationship" (see Family Ct Act, § 614). There is only a general allegation in the petitions that the Agency has made "consistent efforts to have the parents maintain contact with or plan for the future of the children and although the parents are financially and physically able to do so they repeatedly neglected to keep appointments to see the child or make plans

for the child's future."[2] The petitions then attempt to specify the efforts of the Agency to strengthen and maintain the parental relationship between appellant and his children. These too are all in conclusory fashion.

The term "diligent efforts" has now been defined by the Legislature as:

"[R]easonable attempts by an authorized agency to assist, develop and encourage a meaningful relationship between the parent and child, including but not limited to:

"(1) consultation and cooperation with the parents in developing a plan for appropriate services to the child and his family;

"(2) making suitable arrangements for the parents to visit the child;

"(3) provision of services and other assistance to the parents so that problems preventing the discharge of the child from care may be resolved or ameliorated; and

"(4) informing the parents at appropriate intervals of the child's progress, development and health." (Social Services Law, § 384-b, subd 7, par [f].)

■ The Agency is required to mold its efforts in the context of and in recognition of a parent's individual situation. The Agency and the parent "cannot be viewed as equals in the planning process" (Matter of Joyce Ann R., 82 Misc 2d 730, 733), and "[a]gency efforts correlative to their superiority are obligatory" (Matter of Sydney, 84 Misc 2d 932, 934). The Agency's neglect in fulfilling its express statutory duty cannot be excused or justified because it would have been difficult or burdensome for the Agency to undertake such efforts due to the parent's predicaments. Additionally "the statute should be construed in favor of the [appellant] because of the human relationship" (Matter of Anthony "CC", 48 AD2d 415, 418-419, mot for lv to app den 37 NY2d 708). Finally, we have pointed out that the statute is "extremely harsh and seems contrary to human instincts and should only be implemented under the most stringent circumstances" (Matter of Peter "DD" v St. Lawrence County Dept. of Social Servs., 48 AD2d 956 [HERLIHY, J., concurring]).

■ The petitions allege that appellant was advised that if he

---

2. The record contains no support for the allegation that appellant failed to keep visitation appointments. To the contrary, a foster mother testified that "I cannot say that I remember that he [appellant] did that."

did not make plans for the children he would be faced with a permanent neglect action; the caseworker testified that she advised appellant as to the importance of formulating permanent plans for the children. An ultimatum from the Agency, however, does not, *ipso facto,* constitute diligent efforts (see *Matter of Joyce Ann R., supra,* p 732). The Agency never attempted to formulate any viable suggestions as to how appellant could alleviate his troubles. The record fails to indicate that it ever took the time to investigate appellant's financial problems. The suggestions that were made—alternate employment with less working hours, utilizing a day care program in Oneida County where appellant worked, and hiring a housekeeper—reflected a lack of understanding and sensitivity to appellant's predicaments. He could not lessen his hours, hire a housekeeper or utilize a day care center because he was heavily in debt. He is a baker by training and, since he was required to work long night hours, a day care center was likewise of no help. Thus, as far as the record discloses, the Agency made no concrete proposals in fulfillment of its statutory duty of "developing a plan for appropriate services to the child and his family" (Social Services Law, § 384-b, subd 7, par [f], cl [1]), and never truly assisted appellant in an affirmative fashion (cf. *Matter of John "W",* 63 AD2d 750).

The statute also mandates that the Agency make "suitable arrangements for the parents to visit the child" (Social Services Law, subd 7, par [f], cl [2]). After appellant moved from Otsego County (where his children were residing with the Agency) to Oneida County where he had obtained employment, he requested that he be allowed to take his children for one or two weeks. Petitioner denied this request. When appellant requested that the children be transferred to Oneida County so that he could see them more often, the Agency indicated that it would oppose such a transfer. The Agency knew that appellant lived over one hour from where his children resided and that his long working hours made visitations impractical.

Appellant repeatedly informed the Agency and the Family Court of his objective to retake his children when he remarried. We are impressed that he has consummated his plan for the return of his children. He has remarried and his wife, a graduate of Hartwick College, unequivocally testified at the fact-finding hearing that she not only wants to live with the

children but also that she would be able to take care of and help raise them. Appellant is now in a position to provide a permanent and secure home for his children. This was made known to the Family Court at the dispositional hearing, but was rejected because appellant had failed to provide it six or seven years ago—a time which would have shortly followed the departure of his former wife. In our view, appellant should be given an opportunity to be reunited with his children, who, because of their ages, are difficult to place children (see 18 NYCRR 431.7 [a] [3]).

A thorough and careful examination of the record reveals that the Agency's dealings with appellant were routine, and at times perfunctory. The State's first obligation is to reunite a child with his family when he has left home (Social Services Law, § 384-b, subd 1, par [a], cl [iii]). Upon this record, we are unable to say that the Agency has complied with this obligation.

The orders should be reversed, on the law and the facts, and the petitions dismissed, without costs.

GREENBLOTT, J. P., KANE, MAIN, MIKOLL and HERLIHY, JJ., concur.

Orders reversed, on the law and the facts, and petitions dismissed, without costs.