66258. IN RE L. A.; P. G.; J. G.; A. A.

DEEN, Presiding Judge.
On August 28, 1982, the Georgia Department of Human Resources filed a petition in juvenile court to terminate the parental rights of Larry Griffin and Lucy Atwell in their four children ages 4, 3, 2 and 1, alleging that the father had abandoned all interest in the children and that they were deprived and neglected. A hearing was held on October 27, 1982, and the trial court granted the termination request. Lucy Atwell appeals.

The evidence shows that Griffin and Atwell never married, that Griffin is the father of all four children, and that he does not reside in the home or provide any support for his family. The mother is 23 years old, mildly retarded, attended school to the eleventh grade, and can read and do arithmetic.

The children's neglected condition was reported to the department in early February 1979, by a pediatrician who testified he had treated the children on approximately sixty occasions since 1978. He first saw the oldest child, a boy, in the hospital shortly after his home delivery. When the child was two years old, he had to be hospitalized for four days to treat acute bacterial pneumonia. Antibiotics were prescribed upon his release, but the child became acutely ill and had to be readmitted because his mother failed to give him the necessary medication. The doctor also found him to be very dirty and underdeveloped both physically and mentally for his age. The second child, a girl, was hospitalized in 1979 when she was three weeks old for cellulitis of her neck and buttocks. The tissue breakdown was attributed to uncleanliness. The physician noted in his discharge summary that she was unbelievably dirty, with dried feces between her hips; that the mother knew nothing about child care and lived in a home with no running water, and the child had not been bathed since dismissal from the hospital at the time of her birth; and that he was of the opinion that she was a prime candidate for perinatal death due to unintentional maternal neglect. After treating this child, the doctor notified the Public Health Department so it could monitor the family.

The third child, a girl, was brought to the hospital emergency room shortly after her home birth in shock, with vital signs low or absent. She was revived and discharged several days later. The youngest child, a boy, was admitted to the hospital when he was three weeks old, suffering from prolonged viral diarrhea. At four and one-half months, he was readmitted because he was suffering from starvation and dehydration. It was noted the mother had been feeding him from a bottle that had old coke and curdled milk in it. The doctor was of the opinion that the children had more frequent coughs and colds and delayed physical and mental development because of their home conditions, but that the neglect did not appear to be intentional.

A caseworker who monitored the family until April 1982 testified that the department was notified of the neglected condition of the children by the doctor, and on her first visit she found the little girl suffering from the aforementioned skin condition and her eleven-month-old brother unable to sit alone. On this visit she noticed that there were holes in the walls, rats present in the house, and dirty linen on the beds; and that Atwell did not understand basic infant care, such as how to bathe a baby. On subsequent visits, she found the house to be absolutely filthy; the children wet, dirty and inappropriately dressed for the weather; an unbearable stench in the home from soiled diapers lying on the floor; an open bucket which served as a chamber pot in the corner containing dried feces and urine; and rotten food hanging out of the refrigerator. The babies were drinking out of unclean bottles, beer cans littered the floor, and in warm weather the flies were all over the house and crawling on the younger children as they lay in bed. In cold weather the house was very cold because the wind was blowing through broken window panes, and the open wood-burning heater had no protection around it to prevent the children from burning themselves. On August 4, 1981, the caseworker discovered the youngest boy to be very ill and had him admitted to the hospital, where he was diagnosed as suffering from starvation and dehydration. On a noon visit she found the house in complete disarray, with food and laundry detergent spilled all over the floor and the three-year-old girl in the midst of the mess cooking breakfast on a hot plate while her mother slept. The same hot plate later caused a fire in the house when it came in contact with a bedspread. Testimony by other social workers revealed the presence of maggots on the floor of the house and in the children's clothing. The clothing apparently had not been laundered for months, and when the caseworker attempted to show Atwell how to launder it, maggots fell out of the clothing onto the laundromat floor.

Application was made for the family to the Burke County Training Center so the mother could receive instruction in parenting skills and the children could receive the mental stimulation necessary for their development. It was arranged for a homemaker's aide to go into the home once a week to teach Atwell basic homemaking skills. The department also arranged in May of 1982 to have the house completely cleaned and obtained donations of used furniture for the family to use. One week after this effort, the caseworkers found the same dirty and inhumane conditions had returned. The homemaker's aide testified that she attempted to teach Atwell basic skills, but that there had been no real improvement since she had been helping her and that Atwell was not capable of doing anything on her own for the family. Her most recent visit was made the Friday prior to the hearing, and she found the house dirty, with dirty diapers lying around. Rotten meat was most recently found in the refrigerator on October 1, as was the open chamber pot in the corner of the room.

There was also testimony by the caseworker, the director of the service center, and the instructor of the training center that they had to take charge of Atwell's finances because the welfare money was not being used for the children's benefit, but was being given to Larry Griffin for his own personal use. As a result, they discovered Atwell was two months behind on her electric bill and three months behind on her rent. A bank account was opened which required the signature of a social worker or training instructor on each check Atwell wrote. Atwell, however, stole the checks from the instructor's pocketbook and either forged her signature or had it forged and was discovered to be $150 overdrawn at the bank. The caseworkers also discovered that she renewed a loan at Griffin's request and applied for another, claiming to be the sole payee on her welfare checks. As a result, the department had to take complete control of her finances.

Atwell admitted to all the filth in her home in the past, but claims she loves her children and is trying harder since DFCS took action to sever her parental rights. The social worker at the child development center where the older children spend part of the day testified that when they first arrived they were dirty, smelly and withdrawn. They now arrive clean and are adjusting to the center. The training instructor who has worked extensively with the family since 1980 testified that she had never seen conditions in any family that were worse than in this one, but had noted some improvement, such as an interest by Atwell in disciplining the children. While she originally agreed with the decision to terminate Atwell's parental rights, she now had reservations because the young mother was

showing some improvement. She attributed the change to the threat to terminate parental rights.

A psychological report based upon a psychologist's examination of Atwell on September 23, 1981, stated that, "Ms. Atwell does not appear to be concerned about the disposition of her children. In view of the chronic aspects of her behavior, it is doubtful whether her motivation could be modified significantly so that she would show major changes or improvement in her mothering skills. Because of her major lack of concern and apparent low level motivation, it is doubtful whether there will be any significant improvement in the treatment of the children, even with psychological or social agency intervention." A behavior specialist testified that psychological evaluations had been done on each of the children and that the family has a history of mental retardation. The IQ scores of the children ranged from 56 to 85, with an inverse correlation to age. Three of the children were tested on the Vineland Social Maturity Scale, and the youngest child is shown to be functioning socially at a level slightly higher than his age, whereas the youngest girl and oldest boy were slightly lower. No score could be obtained on the oldest girl. The specialist found L.A. and J.G. had problems with language delay and short attention spans, but that the service center had affirmatively improved their skills, and she recommended alternative home placements for all four children. *Held:*

Under OCGA § 15-11-51 (a) (2) (Code Ann. § 24A-3201) the trial court is authorized to terminate parental rights if: "The child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral or emotional harm." Clear and convincing evidence of these elements is required to authorize termination of parental rights. Santosky v. Kramer, 455 U. S. 745 (102 SC 1388, 71 LE2d 599) (1982).

The trial court found that under the standards set forth in *Chancey v. Dept. of Human Resources,* 156 Ga. App. 338 (274 SE2d 728) (1980), termination of parental rights was authorized because "... there had been without a doubt a showing of parental unfitness caused by intentional and unintentional misconduct resulting in abuse and neglect of the children, and that this misconduct is tantamount to physical and mental incapability to care for the children. There is sufficient evidence of profoundly detrimental and egregious parental misconduct by Lucy Atwell and Larry Griffin." In setting forth the facts, the court in the present case noted the testimony that the conduct was likely to continue in the future because of Atwell's lack of motivation to properly care for the

children. We fully agree with the conclusions contained in the lower court's decision. The facts in this case are even more repugnant than those set forth in *Vermilyea v. Dept. of Human Resources,* 155 Ga. App. 746 (272 SE2d 588) (1980). Although appellant argues that child abuse was not shown by the evidence, we must disagree. The training instructor testified that the children had been neglected and abused on many different occasions since 1980. Although child abuse was not labeled as such by the many witnesses who testified, the evidence is replete with descriptions of the inhumane conditions under which the children were forced to live and also as to the mother's indifference to either their physical welfare or mental development. Such conditions could be considered to be abuse rather than neglect. If the parents' conduct were found to be intentional, their behavior could possibly even be sufficient to have subjected them to criminal prosecution for mental and physical child abuse. While the threat of termination did appear to cause an improvement in Atwell's behavior and attitude, her past actions were properly considered by the court in determining whether such conditions were likely to continue in the future. *Griffith v. Dept. of Human Resources,* 159 Ga. App. 649 (284 SE2d 666) (1981); *Jones v. Dept. of Human Resources,* 155 Ga. App. 371 (271 SE2d 27) (1980); *Roberts v. State,* 141 Ga. App. 268 (233 SE2d 224) (1977). The evidence of her lack of motivation in the past, and her present living conditions, which the homemaker's aide testified showed very little improvement, would certainly form a valid basis for the court's decision. Severing parental ties is a harsh judicial decision, however, in light of the totality of all the evidence presented, this court will not interfere with the exercise of the trial court's discretion as factfinder in its decision to terminate Atwell's parental rights. *McCormick v. Dept. of Human Resources,* 161 Ga. App. 163 (288 SE2d 120) (1982). We cannot say the evidence is not clear and convincing and that there is no competent evidence to uphold the lower court's decision. We further find that " '. . . after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.' " *Blackburn v. Blackburn,* 249 Ga. 689, 694 (292 SE2d 821) (1982).

*Judgment affirmed. Banke and Carley, JJ., concur.*

DECIDED MAY 20, 1983 —
REHEARING DENIED JUNE 9, 1983.

*David Riemenschneider, Lisa J. Krisher, William J. Cobb,* for appellant.

Michael J. Bowers, Attorney General, David C. Will, Assistant Attorney General, Gary A. Glover, Special Assistant Attorney General, for appellees.