74646, 74647. IN THE INTEREST OF J. L. Y.
(361 SE2d 246)

BEASLEY, Judge.

Both mother and father of J. L. Y. appeal from the juvenile court's order terminating their parental rights. Their appeals are consolidated.

J. L. Y. was born in 1978 to Patricia Bivens and Jimmy Yaughn while Mrs. Bivens was still married to another. Yaughn took the male child, then age four, away from the mother who lived in south Georgia and he and the child moved to Gainesville. In 1982, J. L. Y. was first brought to the attention of Department of Family and Children Services because of complaints of physical abuse and alcohol abuse by Yaughn.

*Case No. 74646*

The mother's appeal we examine. While Bivens claimed not to know the whereabouts of the child, her sister was keeping him for Yaughn in 1983 and the uncontradicted evidence at the hearing showed that she knew of his location at least by November 1983. She made no effort to contact the child until the Department of Family and Children Services discovered her name and contacted her in July 1984. At that time she did begin to visit with the child and in March 1985 she attempted to obtain custody of him. The court at that time found that the child was deprived on the ground that she had abandoned the child and was unfit. The order was not appealed.

Although Bivens was granted visitation rights by that order, she made no attempts to see the child after April 1985, when she had telephone contact with him.

1. The mother challenges the termination on the ground that there was insufficient evidence from which to find abandonment because there was no evidence that she intended to "sever entirely" the parental relationship. This is not the appropriate question to address, however, in the context of the order appealed. That order took as its premise the unappealed order of 1985 finding that she *had* abandoned the child. Not having appealed, she is bound by that determination. See OCGA §§ 9-12-40; 9-12-42; *Blackburn v. Blackburn*, 168 Ga. App. 66, 72 (2) (308 SE2d 193) (1983); *Wehunt v. Wren's &c. Condo. Assn.*, 175 Ga. App. 70, 73 (4) (332 SE2d 368) (1985); *First Fed. Savings &c. Assn. of Gainesville v. Gainesville Nat. Bank*, 224 Ga. 150, 151 (160 SE2d 372) (1968). Thus, as to the mother, the question is only

whether the court was correct in finding that the requirements of OCGA § 15-11-81 (b) (4) (A) & (C) had been met.

The termination of parental rights is a decision of drastic significance which requires deliberate scrutiny and caution. *In re N. F. R.*, 179 Ga. App. 346, 348 (346 SE2d 121) (1986). It is done based only on clear and convincing evidence. *Blackburn v. Blackburn*, 249 Ga. 689, 694 (292 SE2d 821) (1982). On review of such a decision, the standard is whether after viewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. *Blackburn*, supra at 694.

So viewing the evidence, it showed that the mother did not have any contact with the child after April 1985, thus totally failing to communicate with the child, provide any support for the child, or to comply with the court's plan designed to reunite her with the child. OCGA § 15-11-81 (C). The only reason alluded to in the evidence for this failure (the mother did not testify) was her fear of the father, as previously communicated to caseworkers. A caseworker had specifically asked her about this in October 1985, however, and the mother had denied that this was a concern.

The court's finding as to the mother is affirmed. See *Tyner v. Tyner*, 170 Ga. App. 877, 878 (1) (318 SE2d 675) (1984).

## Case No. 74647

2. The father's appeal we examine under the same standard. Soon after he arrived in Gainesville with the child, he was reported to the Department of Family and Children Services for abuse and neglect of the child and alcohol abuse. A file was opened and the Department of Family and Children Services began to work with him in a relationship that lasted four years. Twice in 1983 the father gave custody of the child to the Department of Family and Children Services so that he could be detoxified at the Georgia Mental Health Institute. On one of these occasions he lied to the Department of Family and Children Services as to the reason for the temporary custody. Although the order is not in the record, it is not disputed that in August 1983 the father and the Department of Family and Children Services entered into a consent order by which he was to maintain physical custody of the child while the Department of Family and Children Services had legal custody. In April 1984, the father went before a citizens review panel which apparently reviewed the situation and made recommendations as to the father's recovery and planned reconciliation with his child. On May 30, 1984, pursuant to the Department of Family and Children Services' petition, the child was declared to be deprived, and legal and physical custody were placed in the De-

partment. In that consent order, which forms the core of the present dispute, the father was ordered to do three things in order to regain custody of his son: (1) attend Alcoholics Anonymous three times a week; (2) provide the name of his AA sponsor to the Department of Family and Children Services; and (3) refrain from drinking any alcoholic beverages. All of these steps were to be done until August 1, 1984, when, if he complied, the child was to be returned. He did not.

Upon the hearing of the mother's petition for custody in 1985 at which the father was present and participated, the court made the following finding concerning the father: "the father . . . has failed to comply with this Court's order of May 30, 1984 in that he has not attended Alcoholics Anonymous meetings at least three times a week, failed to provide sponsor's name to Department of Family and Children Services, failed to refrain from drinking alcoholic beverages . . . ."

Again, the Department tried to work with the father, setting up a plan for him to take antabuse and be routinely tested for alcohol abuse, since by this time he was refusing to go to the mental health agency for counseling and the agency had exhausted the programs to try with him, for he would not cooperate and had finished none of the treatment he had begun. He was not successful on the antabuse and testing program because he was able to take antabuse and continue to drink, which he did.

In March 1986, another order was entered by the court, apparently in another effort to arrange for the child's return to the father. Although this order is not in the record, it is not disputed that it required the father to continue working, to improve the living conditions, to go twice weekly for breath tests, to continue with counseling; it specified that if he ever registered .05 on his test, the child would be taken away. The child was then returned to him on April 4, 1986, and taken away again on June 23, 1986, precipitating the present termination proceeding.

The father does not dispute that he drank during this 1986 period when he had the child, but denied "being drunk." The child, eight at the time of the hearing, stated that during his stays with his father, the father always got drunk and passed out; that he generally was fed by a neighbor; that he and his father slept together on a couch; that he wanted his father to quit drinking and felt that his father could hurt him. The social worker handling the case in 1986 stated that on a June visit to the trailer, she found stagnant water standing in the sink, no linens on the beds, little food in the refrigerator, and empty liquor bottles in the trash. Photos of the premises contained in the record verify these conditions. While in his father's care during the April-to-June '86 period, J. L. Y. dropped from a size 10 to a size 5 or 6. He also returned home with a badly infected finger

which had not been examined by a doctor.

A psychologist, a child therapist, and a social worker all testified that the father acknowledged use of alcohol but denied a problem with it, and that denial was the first hurdle to be met by an alcoholic. In the opinion of these professionals, J. L. Y. was exhibiting the symptoms of the "caretaker role" often assumed by the family of an alcoholic. It was further their opinion that this role would lead to frustration, guilt, and unrealistic expectations on the child's part, and that if he remained with the father he was likely to model the alcoholic behavior.

Further, there was expert evidence concerning the need for stability in the child's life and the documented adverse effects on children who remain in foster care for lengthy periods of time. See *In re G. M. N. & D. M. N.*, 183 Ga. App. 458 (359 SE2d 217) (1987) concerning "foster care drift."

It is without question and uncontested by the father that the child has been deprived since 1983 when the first consent order was entered, satisfying OCGA §§ 15-11-2; 15-11-81 (b) (4) (A). While it is true that past deprivation is not sufficient for termination without a showing of present deprivation, the past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue. *In re L. A.*, 166 Ga. App. 857, 861 (305 SE2d 636) (1983); *In re G. M. N. & D. M. N.*, supra.

The father, approximately 56 years old at the time of the hearing, has refused to acknowledge any problem with alcohol and has steadfastly refused to change his drinking habits in the face of numerous court orders and plans initiated in an effort to reunite him with his child. His plea before us is very similar to that made by the father in *In re G. M. N. & D. M. N.*, supra. Here, as there, the Department has repeatedly provided the father with options, services, and encouragement in an effort to reunite him with his child. (Yaughn testified that the first caseworker assigned to him was the "best caseworker he ever saw.") Despite these efforts, only minimal improvement was made in the physical conditions in which he and the child lived and no improvement was made in his alcoholism treatment. His only plea to the court was that he would try to do better, given another chance. Such is not enough. "In a case such as this, a plea of 'six more months' to improve is without force to overcome the proof of unrelieved detriment already suffered by the [child] for [his] entire life, where there is no indication but the promise to suggest hope of improvement." *In re G. M. N. & D. M. N.*, supra at p. 461. The decision as to a child's future must rest on more than positive promises which are contrary to negative past fact.

The court did not err in terminating the father's rights under OCGA § 15-11-80 (b) (4) (A), (B), & (C). *Blackburn v. Blackburn,*

supra; *In re B. G.*, 180 Ga. App. 502, 503 (1) (349 SE2d 509) (1986).

3. The father also contends that the trial court failed to make the specific factual findings to support the required legal standards for termination, as required by OCGA §§ 15-11-33 & 15-11-91. Part of his complaint is that several of the orders with which he failed to comply are not contained in the record but were orally testified to. No objection was made to this below and, in fact, the father acknowledged that these orders had been entered. Thus, any objection on this ground has been waived. *Durrence v. Durrence*, 224 Ga. 620, 625 (4) (163 SE2d 740) (1968); *Riley v. State*, 180 Ga. App. 409, 411 (1) (349 SE2d 274) (1986).

The record demonstrates that the court in its order did make specific findings concerning each legal element required for termination of parental rights.

*Judgment affirmed. McMurray, P. J., and Sognier, J., concur.*

DECIDED SEPTEMBER 18, 1987.

*G. Hammond Law III*, for appellant (case no. 74646).
*Robert L. Chandler*, for appellant (case no. 74647).
*Michael J. Bowers, Attorney General, Carol A. Cosgrove, Senior Assistant Attorney General, John A. Dickerson, Edward H. Lindsey, Jr., Eugenia M. Benedict*, for appellee.