### In re JOSEPH P. and Lisa P.

Supreme Judicial Court of Maine.

Argued June 10, 1987.
Decided Oct. 28, 1987.

Edward B. Miller (orally), Rockland, for appellant.

Anita P. Volpe (orally), Union, guardian ad litem.

Erna P. Koch (orally), Asst. Atty. Gen., Human Services Div., Augusta, for appellee.

Before McKUSICK, C.J., NICHOLS, GLASSMAN, SCOLNIK and CLIFFORD, JJ., and WERNICK, A.R.J.

CLIFFORD, Justice.

Teresa P., mother of Joseph P. and Lisa P., appeals[1] a judgment of the District Court, Rockland, terminating her parental rights pursuant to 22 M.R.S.A. § 4055 (Supp.1986). She contends that the District Court's termination order is not supported by clear and convincing evidence and that

---

1. Title 22 M.R.S.A. § 4006 (Supp.1986) authorizes direct appeals to the Law Court from orders terminating parental rights.

the Department of Human Services (Department) did not do all that was necessary to achieve reunification and rehabilitation of the family as provided by 22 M.R.S.A. § 4041 (Supp.1986) before terminating parental rights. We affirm the judgment.

Joseph P. was born on June 13, 1978, and Lisa P. was born on September 10, 1980. On September 26, 1984, the Department filed a child protection petition and a request for a preliminary protection order pursuant to 22 M.R.S.A. §§ 4031–4039 (Supp.1986), when Joseph and Lisa, then aged six and four respectively, were discovered to have severe bruises on their buttocks as the result of a spanking with a wooden paddle wielded by Kevin S., Teresa's live-in boyfriend. The District Court found that the children were in immediate risk of serious harm and ordered that they be placed in the custody of the Department pending entry of a final protection order. *See* 22 M.R.S.A. §§ 4034–4036. After Teresa and Kevin married in October 1984, Kevin was joined in the proceedings.

Following hearings on January 30 and February 13, 1985,[2] the court granted the Department's petition for a final child protection order. The court found that if the children were returned home they would not be protected from sexual or physical abuse.

During the ensuing months the Department's efforts to develop a reunification plan were unsuccessful. Teresa and Kevin refused to sign service agreements outlining a program of visitation and therapy. Teresa frequently missed weekly visits with her children, who were in foster care, because Kevin would not participate with her and she would not visit without him. Occasionally a month passed without Teresa seeing her children. Twice, on January 31 and November 19, 1985, Teresa moved pro se for voluntary termination of her parental rights, although she later withdrew both motions.

In the fall of 1985 the Department sent a licensed clinical social worker to conduct an evaluation of the family. After conducting several interviews with Teresa, her children, and their foster mother, the social worker concluded that Teresa was unable to protect the children from abuse and would choose to maintain her relationships with boyfriends over the well-being of her children.

At the Department's request, Dr. Daniel Hughes, a clinical psychologist who had first evaluated the family's home life in September 1984, conducted an investigation in February and March 1986 to assess the children's progress in foster care and to make recommendations regarding further attempts at reunification and long-term planning for the children. Dr. Hughes found that the children were faring well in foster care and that their relationship with Teresa was not important to them. Dr. Hughes also examined Teresa and diagnosed a serious personality disorder which, even after intense psychotherapy, was unlikely to change. In view of Teresa's problem, the lack of progress in reunification during the intervening one and a half years, and the necessity for finding a permanent placement for the children, Dr. Hughes recommended that reunification efforts cease, and the Department begin taking steps to find such a permanent placement.

On March 26, 1986, the Department petitioned the District Court, pursuant to 22 M.R.S.A. §§ 4050–4055 (Supp.1986), for termination of Teresa's parental rights in order to free the children for adoption. The Department alleged *inter alia* that Teresa was dependent on Kevin and was either unwilling or unable to protect the children from him and that she failed to make a good faith effort at reunification.

On Teresa's motion the District Court on April 30 entered an order continuing the hearing to October 27, 1986, because of the "substantial change taking place with re-

---

**2.** The hearing on the final protection order was originally scheduled for November 14, 1984. The delay was principally caused by difficulties encountered in obtaining Kevin's mental hospi-

tal records and reports. Kevin was diagnosed as having a paranoid personality disorder with a secondary diagnosis of borderline personality disorder.

gard to Teresa's marital status."[3] The court ordered the Department "to reinstitute a reunification plan and [to] make efforts to bring the mother and children back together."

The Department developed a reunification plan specifically aimed at strengthening the bonds between Teresa and her children. The Department arranged for Teresa to have weekly sessions with the social worker and weekly supervised visits lasting an hour with her children at the Department's offices. The social worker was either to observe firsthand Teresa's visits with her children or to receive reports from the Department's case aides. In his weekly sessions the social worker went over Teresa's visits with her children and gave her feedback and coaching on ways she could use the time she spent with her children to strengthen the bonds. It was also arranged that Teresa should be examined by Dr. Brian Rines, a licensed clinical psychologist who was also to evaluate the reunification plan to see if it was adequate to achieve reunification. The service agreement, which was to remain in effect for three months, provided for lengthened visits with the children if Teresa showed improvement.

Throughout the summer Teresa complied with the regimen set up by the service agreement, rarely missing a scheduled session or visit, and then only when public transportation, on which she was dependent, was unavailable. She did not, nevertheless, always follow the social worker's suggestions. After a meeting on August 14, 1986, between her attorney and Department officials, the visits were lengthened to two hours and three excursions outside the Department's building were permitted: a trip to the seashore, a trip to a restaurant, and a trip to a municipal playground. Teresa's attorney also arranged for Dr. Paul Sobchuk, a licensed psychologist, to examine Teresa and to evaluate her abilities as a parent.

On October 27 and November 24, 1986, the court held hearings on the Department's March 26 petition to terminate Teresa's parental rights. The court found that, although Teresa had complied with the terms of the service agreement, she had done so without the commitment necessary to succeed. The court further found that the relationship between Teresa and her children had not improved. The court also found that

> Teresa simply does not possess, nor is it a reasonable certainty that after treatment that she will possess, the ability to see to the needs of these children. The court is satisfied that by clear and convincing evidence the Department has shown that Teresa is unable to protect the children from jeopardy and that her circumstances are unlikely to change within a time which is reasonably calculated to meet the needs of her children.

> The court is satisfied also that, although Teresa has participated in good faith efforts made by the State in reunification and rehabilitation, those efforts have not produced nor will they produce within a reasonable time a situation in which Teresa will be able to care for and protect the children.

Accordingly, the court entered an order terminating parental rights on January 20, 1987.

## I.

Teresa's first contention on appeal is that the District Court's findings were not supported by clear and convincing evidence. Section 4055, the controlling statute for nonconsensual termination of parental rights, requires that the court find, based on clear and convincing evidence, that:

(a) Termination is in the best interest of the child; and

(b) Either:

(i) The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change

---

3. After separating from Kevin in February 1986, Teresa successfully prosecuted pro se a divorce in September 1986. We note that the same District Court judge presided over all of the proceedings concerning custody and termination of parental rights as well as the divorce.

within a time which is reasonably calculated to meet the child's needs; [or]

(ii) The parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs; ...

22 M.R.S.A. § 4055(1)(B)(2). *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). "Where clear and convincing evidence is required, the appropriate standard of appellate review is 'whether the fact finder could reasonably have been persuaded that the required factual finding was or was not proved to be *highly probable.*'" *In re John Joseph V.*, 500 A.2d 628, 629 (Me.1985) (quoting *Taylor v. Commissioner of Mental Health and Mental Retardation*, 481 A.2d 139, 153 (Me.1984) (overruling *Horner v. Flynn*, 334 A.2d 194 (Me.1975)) (emphasis added); *see also In re Debra B.*, 495 A.2d 781, 783 (Me.1985).

The District Court found that Teresa is unable to protect her children from jeopardy and that the circumstances are unlikely to change within a time that is reasonably calculated to meet their needs and also that she is unable to take responsibility for her children within a time that is reasonably calculated to meet their needs. We have previously construed the word "unable," as it is employed in this statute, to be synonymous with incapable, for whatever reason, either to protect a child from jeopardy or to take responsibility for a child. *In re Christopher J.*, 505 A.2d 795, 797 (Me.1986), *cert. denied sub nom. Coombs v. Maine Dept. of Human Services*, ⸺ U.S. ⸺, 107 S.Ct. 1372, 94 L.Ed.2d 687 (1987); *In re John Joseph V.*, 500 A.2d at 630. Having closely examined the record before the District Court, we conclude that it did indeed contain the quantum of proof necessary to support the District Court's findings of fact.

The three psychologists who examined Teresa were unanimously of the opinion that she suffered acutely from a dependent personality disorder that made it impossible for her to respond adequately to her children's needs. Moreover, they testified that she had a pronounced propensity for subordinating the children's needs to her own need for support from third parties, typically abusive or unstable males, and was incapable of gauging the impact of these third parties on her children. The psychologists were also virtually unanimous in their conclusion that Teresa would have to undergo one to five years of intensive therapy and even then the hopes for substantial change were slim at best. In the meantime, the children would have to remain in the temporary environment of foster care awaiting unpredictable results of Teresa's treatment. The evidence was sufficient in justifying the District Court in finding that the grounds for termination set out in 22 M.R.S.A. § 4055(1)(B)(2)(b) were satisfied.

A review of the record reveals there is clear and convincing evidence that termination is in the best interests of the children. The unrebutted testimony was that in September 1984 when they were living at Teresa's home they were hyperactive and disobedient. Then, in February 1986, after one and a half years in foster care they were well-behaved. The unanimous testimony was that despite the efforts of the Department there was very little interaction or manifested affection between Teresa and her children, even though they saw each other weekly between February and October 1986. By contrast, the children were doing well in foster care and had formed strong emotional ties with their foster mother and foster siblings. The children have disparate needs which Teresa cannot now meet, and, as they grow older, they will probably overwhelm her if she resumes full-time custody. But even before that is a possibility, Teresa must undergo extensive therapy, probably lasting for years, while the children remain in foster care. In that event, while they await a doubtful result the children will be denied a permanent environment and home life.[4]

---

**4.** The clear legislative intent of the Child and Family Services and Child Protective Act, 22 M.R.S.A. §§ 4001–4071 (Supp.1986), is the protection of children, and in carrying out this intent, to promote either reunification of the child with his or her family, or where reunifica-

Even if treatment is successful the children will be forced to make a transition years from now when the gravity of disruption is in direct proportion to the lapse of time. In the opinion of Dr. Sobchuk, who examined Teresa and her children at the request of Teresa's attorney, the best interests of the children would not be served by requiring the Department to continue its reunification efforts. Moreover, there was ample evidence from which the District Court could conclude that Teresa's pronounced tendency to ally herself with abusive and irresponsible males posed a significant threat to the well-being of the children if they were returned to her care. This evidence supports a finding to a high probability that termination of Teresa's parental rights is in the children's best interests in order to assure their stability and well-being.

## II.

 Teresa also contends that in light of her severe psychological problems the Department did not do everything it could have to achieve reunification as provided in 22 M.R.S.A. § 4041 (Supp.1986). We note that the Department sought outside expert advice in putting together the May 1986 service agreement. The Department's strategy was to employ weekly visitations reinforced with counseling aimed at strengthening the parent-child bond with the specific goal that the visitations be expanded and developed if the relationship between Teresa and her children showed signs of improvement during the term of the agreement. It could be that, had the Department used another approach or made extraordinary efforts, Teresa might have shown slight improvement during the term of the service agreement. However, assuming the validity of Teresa's assertions, they would not affect the outcome of this case.

"We simply do not detect any legislative intent that the [D]epartment's reunification efforts be made a *discrete* element of proof

tion is not possible, placement of the child in a permanent situation. *See* 22 M.R.S.A. §§ 4003(4) & 4050.

in termination proceedings." *In re Daniel C.*, 480 A.2d 766, 770 (Me.1984); *see also In re Maria C.*, 527 A.2d 318, 319 (Me.1987). Rather the quality and character of the Department's reunification efforts affect the District Court's "evaluation of parental conduct in determining the existence *vel non* of the grounds for termination stated in section 4055(1)(B)(2)." *In re Daniel C.*, 480 A.2d at 771. The District Court found that Teresa complied with the terms of the service agreement but that the effort was unsuccessful. This indicates only that Teresa was willing but unable to overcome the difficulties that lay between her and reunification.

The entry is:

Judgment affirmed.

All concurring.