**In re SHANNON R., et al.**

Supreme Judicial Court of Maine.

Argued March 21, 1983.

Decided May 26, 1983.

James E. Tierney, Atty. Gen., Judith Fletcher, Asst. Atty. Gen. (orally), Augusta, for Dept. of Human Services.

Snyder & Jumper, Ervin D. Snyder (orally), Wiscaasset, for defendant.

John J. Lynch, Damariscotta, guardian ad litem for Shannon R. and Rosealynn M.

Before GODFREY, NICHOLS, ROB-ERTS, CARTER, VIOLETTE and WATH-EN, JJ.

CARTER, Justice.

After a hearing in District Court (Lincoln County), the parental rights of appellant, Linda R., to her son, Shannon, and to her daughter, Rosealynn, were terminated, pursuant to 22 M.R.S.A. § 4055(1)(B)(2) (Supp. 1982–1983). Linda appealed to the Superior Court (Lincoln County), where the District Court decision was affirmed. Linda now appeals to this Court. We sustain the appeal.

On February 13, 1979, the Maine Department of Human Services filed two emergency petitions for protective custody of Rosealynn and Shannon, pursuant to 22 M.R.S.A. § 3792 (1979).[1] The Department received temporary custody on that date. On June 28, 1979, a hearing was held on those petitions, which Linda attended with court-appointed counsel.[2] The evidence ad-

1. This section and the remainder of 22 M.R.S.A., ch. 1055, "Neglect of Children; Custody" was repealed in 1979 and replaced by the Child and Family Services and Child Protection Act.

2. Wayne M. also attended the hearing; he is the father of Rosealynn. (Linda refuses to name the father of Shannon). On July 6, 1981, Wayne sent a letter to the Department stating

duced at that hearing revealed that Shannon and Rosealynn were not properly clothed, fed, housed, or given proper medical attention. The Department's petitions were granted and the children were placed in the Department's permanent custody.

Approximately two years later, in July, 1981, the Department filed petitions for termination of Linda's parental rights to Shannon and Rosealynn, pursuant to 22 M.R.S.A. § 4052 (Supp.1982–1983). The petitions were consolidated and at the hearing on the petitions, the following facts appeared. Shannon and Rosealynn were placed in separate foster homes [3] in Maine after the Department gained custody. Linda was informed, however, that she could visit the children at the Department offices. After cancelling two scheduled visits, Linda did visit the children once in March, 1979. That visit with Rosealynn, then four months, was uneventful. The visit with Shannon, then two and one-half, was very distressful for Shannon, who began screaming and crying as soon as he saw Linda. Linda later told a Department supervisor that she wanted no more visits because they were "too hard to take." There were no further visits. In fact, Linda had no further contact directly with her children until after the petitions for termination of parental rights were filed in July, 1981.

The Department developed a plan for family reunification,[4] as required by 22 M.R.S.A. § 3803 (1979) and § 4041 (Supp. 1982–1983). In July, 1979, the Department sent Linda a letter outlining this plan. The letter was sent to the address of the mother of her boyfriend, Wayne, which was the address Linda had given the Department. The letter was returned, "Addressee Unknown." Attempts to ascertain Linda's new address through Wayne's mother were unsuccessful. There was no contact between Linda and the Department from July, 1979 to April, 1980 even though Linda had been given the names of contact people and the toll-free number of the Department.

The Department finally obtained Linda's address from her mother. Linda had moved to Pennsylvania. A second letter concerning the reunification plan was sent to her in April, 1980. The Department received a return receipt for the letter from the post office.

In April, 1980, Linda separated from Wayne. She testified that he had beaten her almost every day and that he did not allow her to associate with anyone or to go anywhere. It was for this reason and because of his jealousy of her children that she did not visit her children while she resided in Maine. She began having contact with the Berks County (Pennsylvania) Children and Youth Services Agency shortly after her separation from Wayne.

As a result of Linda's contact with the Pennsylvania Department, Mr. May, the Maine Department worker assigned to this case, began receiving information from the Pennsylvania Department in April, 1980 concerning its contact with her. In June, 1980, May received a report[5] from the

that he did not object to the termination of his parental rights to Rosealynn. Wayne did not attend the termination hearing; his parental rights were terminated. He has filed no appeal of that ruling and is not involved in the present proceeding.

3. Both children were placed in foster homes in February, 1979. Shannon was placed in a second home in April, 1979. Rosealynn lives in Maine. Since August, 1980, Shannon has lived in Florida. Testimony from a child psychologist and a Department social worker established that both children have a good relationship with their foster families and are developing well. Both foster families plan to adopt the children if Linda's parental rights are terminated.

4. The plan required Linda (1) to show some evidence of being involved in parenting skills courses, (2) to show evidence of providing adequate food, clothing, and shelter, (3) to show some willingness to use medical care for the children, (4) to show some willingness to provide a more stimulating environment for the children, and (5) to provide a stable home situation.

5. The Maine Department received a total of three reports and one letter from the Pennsylvania agency. At the hearing on the termina-

Pennsylvania Department. The Maine Department also had telephone contact with the Pennsylvania Department in October or November, 1980. The written report from the Pennsylvania Department stated that Linda wanted her children back and wanted them moved to Pennsylvania so that she could resume contact with them. She did not want visitation with the children in Maine even if that was part of the reunification plan. The report further stated that Linda was no longer living with Wayne and that she was pregnant. In a later telephone conversation, the Pennsylvania Department stated that Linda wanted her children back but did not see any reason why she was required to follow through with the requirements the Maine Department had stipulated as necessary to reunification.

The decision to terminate Linda's parental rights was made in January, 1981. According to May, such decisions are based on two separate conclusions by the Department. The first concerns the possibility of reunification of the family. Based on the Department's difficulty in establishing contact with Linda and her significant resistance to any change in her life style, the Department concluded that it would not be possible to return the children to her. The second conclusion focuses on the interests of the children. In this case, the children needed a secure and stable living arrangement and had formed clear attachments to their foster families. It appeared in the children's best interests to cement those relationships and insure permanence for them. The petitions for termination were filed in July, 1981.[6] Linda was served in hand with the petitions.

Subsequent to the filing of the petitions to terminate Linda's parental rights, Maine Department worker Pejouhy, who took charge of the case after May left the Department, received two additional reports from the Pennsylvania Department and spoke with the Pennsylvania Department on the telephone. The first report, received in October, 1981, stated that Linda had moved in with the Hess family in February or March, 1981, and was currently living with that family.[7] The report stated that it was Linda's "goal in life" to have her children returned to her. To accomplish that, Linda was willing to cooperate fully with the Pennsylvania Department, to write to Rosealynn, to write for reports on her children, and to take a parenting course. The report stated that the only area of the reunification plan with which Linda was not complying was enrolling in a parenting course. Linda testified that she tried to take such a course at four schools in Pennsylvania; all four refused her. One report from the Pennsylvania Department confirmed that such courses are difficult to find in Pennsylvania.

The second report, received in December, 1981, stated that Linda was still living with the Hess family. She had had a third child, who appeared healthy and with whom Linda was acting appropriately. In addition, Linda had found a job.

At the close of the State's case in chief, counsel for Linda moved to dismiss the proceedings and argued that the State had not proved with clear and convincing evidence that Linda "is unable and unwilling to protect the child, or evidence that she has willfully abandoned the child; and there's been no evidence that the circumstances are unlikely to change...." The judge denied

---

tion petitions, defense counsel showed the June, 1980 report to May during his testimony; defense counsel showed the October, 1981 report and the letter to Pejouhy, another Department worker, during his testimony. Neither the reports nor the letter was offered in evidence and none was in the record before the District Court judge or in the record before this Court.

6. The delay in filing the petitions resulted from prolonged efforts by the Department to locate Wayne.

7. Mrs. Hess testified that Linda cares well for her new baby and takes part in the preparation of the meals for the family. Mrs. Hess further stated that there is sufficient room in the house to accommodate Linda and her three children if Linda regains custody.

the motion and ruled that the evidence presented questions of fact, which he would later determine.

In January, 1982, the judge granted the Department's petitions for termination of Linda's parental rights to Shannon and Rosealynn. His order provided, in part:

> The evidence in this case clearly and convincingly points to the conclusion ... that subsequent to that date the Department's various representatives did everything that could reasonably be expected of them to locate Linda ... that neither Linda nor Wayne took any steps to contact the Department, its representatives, or the children, save one visitation about one month after custody was granted to the Department, until nearly two months subsequent to service of the petitions; that the Department's representative, Ronald Pejouhy, was known to both Linda and Wayne; ... that prior to the service of the petition neither Linda nor Wayne took any action seeking visitation of the children, took any action which would tend to indicate the desire, willingness or ability of either to resume custody of the children ... or did anything which indicated to the Department or its representatives that they or either of them wished further consideration as to parental rights to the children; that after the service of the petitions, Linda commenced sending an occasional card and/or letter to each of the children and expressing to the Department's counterpart in Pennsylvania (where Linda lived) her wish to get back her children.

> The evidence satisfies the Court that ... Linda had willfully abandoned Shannon and Rosealynn prior to commencement of the present proceedings. To rule otherwise would stretch the evidence beyond its critical point. For a period of about 23 months (August 1979 through June 1981), Linda, knowing how to reach the Department or one of its offices, completely failed to do so. She made no contact even to advise the Department of her whereabouts to say nothing of ever

expressing her desires to visit with or have any report concerning the children. Unless and until a petition for termination was filed, I find the evidence points to the conclusion that neither parent would change his or her position with regard to either child.

Linda contends that the judge's decision is not supported by a proper evaluation of the evidence adduced at the hearing. We agree.

Title 22 M.R.S.A. § 4055 provides, in part:

> 1. **Grounds.** The court may order termination of parental rights if:

> .    .    .    .    .

> B. (2) The court finds, based on clear and convincing evidence, that:

> (a) The parent is unwilling or unable to protect the child from jeopardy or has willfully abandoned the child or has refused to take responsibility for the child;

> (b) The circumstances are unlikely to change in a reasonable time; and

> (c) termination is in the best interests of the child.

> 2. **Considerations.** In deciding to terminate, the court shall consider the needs of the child, including the child's age, attachments to relevant persons, periods of attachments and separation and the child's ability to integrate into a substitute placement or back into his parent's home.

Clear and convincing evidence is evidence that, by its nature, "has high capability of inducing belief. If it is uncertain, ambiguous or contradictory it cannot be said to be 'clear and convincing' only because by its nature it lacks strong capacity to induce belief." *Horner v. Flynn,* 334 A.2d 194, 199–200 (Me.1975); *see Santosky v. Kramer,* 455 U.S. 745, 747–49, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599, 603 (1982) (due process clause of fourteenth amendment requires that state prove allegations by "at least" clear and convincing evidence before state may sever completely and irrevocably

parental rights). Under the "clearly erroneous" rule, therefore, the judge's findings stand if there is clear and convincing, and not simply competent, evidence to support those findings. *See Harmon v. Emerson,* 425 A.2d 978, 982 (Me.1981).

■ The initial phase in these proceedings must involve some showing by the State that the parent is unwilling or unable to protect the child, that the parent has willfully abandoned the child, or that the parent has refused to take responsibility for the child and that the circumstances are unlikely to change. After that initial showing, the State must show that the termination is in the best interests of the child. *See Smith v. Organization of Foster Families,* 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14, 46–47 (1977) (Stewart, J., concurring) ("If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, I should have little doubt that the State would have intruded impermissibly on 'the private realm of family life which the state cannot enter.' ") We conclude that the Department failed to make the requisite showing by clear and convincing evidence, or by any evidence in some respects. Several of the judge's findings are, consequently, clearly erroneous because they are not supported by evidence of the required clear and convincing quality.

■ The judge found that Linda took no action prior to the service of the petitions "which would tend to indicate the desire, willingness or ability" to resume custody of the children. It is true that Linda had no contact with the Maine Department from June, 1979, the date of the hearing for permanent custody, until April, 1980, when contact with the Pennsylvania Department commenced. Although we do not decide whether Linda's difficulties with Wayne were sufficient to justify this lack of communication, certainly those difficulties constituted a mitigating circumstance to be considered by the Department.[8] In any event, Linda's receipt of the Maine Department's letter, her separation from Wayne, and her contact with the Pennsylvania Department all occurred in April, 1980. Linda testified that she considered that her communication with the Pennsylvania Department was communication with the Maine Department. The acting supervisor of child welfare in the Maine Department of Human Services testified that, in essence, the Maine Department used the counterpart Pennsylvania Department as an extension of the Maine office to get information concerning Linda. It cannot be said that Linda's contact with the Pennsylvania Department clearly did not qualify as contact with the Maine Department.[9]

The June, 1980 report received by the Maine Department from the Pennsylvania Department clearly stated that Linda wanted to regain custody of her children and wanted them placed in foster care in Pennsylvania so that she could visit them. Linda did not want visitation in Maine. Although May testified that the report stated that there was resistance to following through with the requirements, Linda testified that the Pennsylvania Department worker assigned to her case thought that a parenting course was unnecessary, based on Linda's conduct with her new baby.

■ Similarly, the judge's findings that Linda did nothing which indicated to the Department or its representatives that she

---

8. *See In Interest of T.S.L.,* 487 Pa. 245, 248, 409 A.2d 332, 334 (1979) ("a parent, *to the extent circumstances and resources permit,* has an affirmative duty to meet a child's needs for love, protection, guidance, and support and that a mere passively uninvolved interest in or concern for a child is inadequate. . . .") (emphasis in original).

9. Considering that Linda was residing in Pennsylvania and considering the nature of the goals of the reunification plan, *see supra* note 4, Linda's face-to-face contact with the Pennsylvania Department appears to have been a more practical and effective method for achieving the plan goals than simply using the toll-free number of the Maine Department.

"wished further consideration as to parental rights," that Linda had willfully abandoned Shannon and Rosealynn prior to commencement of the present proceeding, and that Linda would not change her position with regard to either child "unless and until a petition for termination was filed" are not supported by clear and convincing evidence. The testimony of May, the Department worker in charge of Linda's case during the very critical period from April, 1980 until January, 1981, when the termination decision was made, shows only that Linda was in contact with the Pennsylvania Department. At oral argument, the State represented that it considered *several* reports from the Pennsylvania Department in making the termination decision and that these reports indicated significant resistance to change on Linda's part. The reports are not in evidence, nor was the Pennsylvania caseworker assigned to Linda's case called as a witness by the State. Consequently, the judge's findings that Linda did nothing to indicate that she wanted further consideration as to parental rights or that she would change her position are based on the Maine Department's subjective conclusion that "[i]t did not seem ... that it was ever likely circumstances would change significantly enough ..." to return the children to Linda. The October, 1981 report from Pennsylvania, also not in evidence, stated that Linda had followed through with every requirement of the Maine reunification plan except one; the one omission may not be Linda's fault entirely.

Further, the judge's finding and the Department's conclusion that Linda abandoned her children is based on the fact that she did not have contact with the children from March, 1979 until January, 1981, when the termination decision was made. This finding must be examined in light of the facts that during that period, Linda moved back to her home state of Pennsylvania, that she asked to have the children placed with Pennsylvania foster families, and that Shannon moved to Florida in August, 1980.

■ Further, May's testimony and, indeed, the entire record is devoid of any suggestion of exactly what the Maine Department did during this critical period with regard to the reunification plan except for sending the letter outlining the plan and reading the reports from Pennsylvania. It is possible to conclude from *this* record that the only party making any effort at all during this period was Linda. We do not think that the Legislature intended that the entire burden in this matter should rest on her. 22 M.R.S.A. § 4003 ("it is the intent of the Legislature that this chapter ... (3) Give family rehabilitation and reunification priority as a means for protecting the welfare of children ..."); 22 M.R.S.A. § 4041(1) ("Family Reunification. When a child has been ordered into the custody of the department under section 4035, it shall provide, arrange or coordinate services to facilitate the rehabilitation and reunification of the parents and child.").[10]

Finally, the findings that "after the service of the petitions," Linda commenced "expressing to the Department's counter-

10. Section 4041 further provides that the services, which the Department shall provide, arrange or coordinate include:
  A. Giving the parents prompt written notice of the following, unless that notice would be detrimental to the best interests of the child:
    (1) The child's residence and, when practicable, at least 7-days' advance written notice of a planned change of his residence; and
    (2) Any serious injuries, major medical care received or hospitalization of the child;
  B. Assuring that the parents have ample opportunity to visit with the child when this is not detrimental to the best interests of the child;

  C. Periodically reviewing with the parents why the child was removed, what must occur for the child to be returned and the services which are available to assist them; and
  D. Petitioning for judicial review and return of custody of the child to his parents at the earliest appropriate time.
    ....
  A. The Department may discontinue these efforts with either parent, if that parent:
    (1) Cannot be located; or
    (2) Refuses or is unable to make a good faith effort toward rehabilitation and reunification.

part in Pennsylvania (where Linda lived) her wish to get back her children," and that

> [f]or a period of about 23 months (August 1979 through June 1981), Linda, knowing how to reach the Department or one of its offices, completely failed to do so. She made no contact even to advise the Department of her whereabouts to say nothing of ever expressing her desires to visit with or have any report concerning the children.

are simply contrary to the evidence. As noted, Linda's contact with the Pennsylvania Department was the equivalent of contact with the Maine Department. Her dealings with the Pennsylvania Department began long before the service of the termination petitions.

It may well be that Linda did seriously resist a change in her position prior to January, 1981. We conclude simply that the Maine Department's conclusion to that effect, in the absence of the very critical report from, and testimony of, the Pennsylvania Department and in the face of the conflicting testimony of Linda, does not constitute evidence having a "high capability of inducing belief" that "the circumstances are unlikely to change," as required by section 4055(1)(B)(2)(b). Similarly, this record offers no clear and convincing proof of abandonment in view of Linda's return to her home state of Pennsylvania, her desire to have the children in Pennsylvania, and Shannon's removal to Florida by the action of the Department. *See Jones v.* *Thompson,* 151 Me. 462, 465, 121 A.2d 366, 368 (1956) (abandonment is question of fact requiring evidence that "parents at some time definitely gave up their parental interests in the child and their duties to it . . . depending largely upon the parent's intention. . . .").

We agree that a mother's mere "flicker of interest" is not sufficient to bar a finding of abandonment. *In re Diana P.,* 120 N.H. 791, 799–800, 424 A.2d 178, 183 (1980), *cert. denied,* 452 U.S. 964, 101 S.Ct. 3116, 69 L.Ed.2d 976 (1981). Our difficulty in this case is that it is possible to determine, from *this* record, that Linda truly showed only a flicker of interest, and that flicker occurred only after the termination decision was made. It is, however, also possible to determine, from this record, that Linda had returned to her home state to improve her situation and to work toward the reunification goals. The very nature of "clear and convincing" evidence argues against two such plausible conclusions from one record. The unsupported and contradicted conclusions of the Maine Department simply do not constitute the kind of evidence contemplated by section 4055(1)(B)(2) to show the first two of the three grounds for termination.[11] *Compare In re Jessica B.,* 121 N.H. 291, 293–296, 429 A.2d 320, 322–23 (1981) (mother expressed no interest in maintaining role as parent and failed to communicate with child for two years, although mother lived within thirty miles of

---

11. Because we find no adequate showing with regard to the first two grounds, we do not review the court's finding on the third ground for termination under § 4055: "termination is in the best interests of the child." § 4055(1)(B)(2)(c). The statute requires proof of all three grounds. Further, "abandonment cannot be predicated solely on the best interests of the child." *Anonymous v. Anonymous,* 25 Ariz.App. 10, 12, 540 P.2d 741, 743 (1975).

The Oregon Supreme Court has poignantly noted:

> the state of [this] family is duplicated in hundreds of thousands of American families, —transiency and incapacity, poverty and instability. The witness was undoubtedly correct when he stated that living in the [parents'] household would not 'allow this child to maximize her potential.' However, we do not believe the legislature contemplated that parental rights could be terminated because the natural parents are unable to furnish surroundings which would enable the child to grow up as we would desire all children to do . . . The best interests of the child are paramount; however, the courts cannot sever . . . parental rights when many thousands of children are being raised under basically the same circumstances as this child. The legislature had in mind conduct substantially departing from the norm and unfortunately for our children the [parents'] conduct is not such a departure.

*State v. McMaster,* 259 Or. 291, 303–04, 486 P.2d 567, 572–73 (1971).

child; finding of abandonment proper) *with State v. Robert H.,* 118 N.H. 713, 719–720, 393 A.2d 1387, 1391 (1978) (although father was not "model parent," he was entitled to same help from welfare department as anyone else, and "maybe more so"; termination of parental rights held error).

The Supreme Court emphasized in *Santosky v. Kramer* that in proceedings involving the termination of parental rights, "the private interest affected is commanding ... [and] the decision terminating parental rights is *final* and irrevocable.[12] Few forms of state action are both so severe and so irreversible." 455 U.S. at 757–59, 102 S.Ct. at 1396–97, 71 L.Ed.2d at 609–10 (emphasis in original) (citation omitted). In holding that the Constitution requires that the standard of proof in such proceedings must be the "clear and convincing" standard and not the "fair preponderance" standard,[13] the Court enumerated the difficulties inherent in such proceedings: (1) imprecise substantive standards that leave determinations open to the subjective values of the judge; (2) unusual discretion of a judge in appraising encounters among agency, child, and parents to underweigh probative facts possibly favoring parents; (3) general poor and uneducated status of parents that makes

proceedings vulnerable to judgments based on class or cultural bias; (4) the State's ability to assemble its case, compared to the parents' ability to prepare a defense; (5) parents have no "double jeopardy" defense against repeated state termination efforts if the State fails initially, even if parents attain the prescribed level of fitness; (6) if the state is successful initially, the termination is final; and (7) victory by the state involves not only the termination of parental rights but the judicial determination that the parents are unfit to raise their own children. 455 U.S. at 760–61, 102 S.Ct. at 1398, 71 L.Ed.2d at 611–13.

Each of these enumerated difficulties is present in this case. As noted, we conclude that the State failed to show by clear and convincing evidence that Linda had abandoned her children and that the circumstances that required the Department's action in gaining custody were unlikely to change, as required by section 4055(1)(B). We also conclude that the judge's findings of abandonment and of an unlikelihood of change of circumstances were erroneous. In addition, we determine that the Department did not meet its burden with regard to reunification efforts, as required by section 4041.[14] We recognize

**12.** The *Santosky* case arose in New York. The Supreme Court noted that the finality of a termination of parental rights was discussed at oral argument. Although counsel for the Department of Social Services asserted that parents may petition to vacate or to set aside an earlier termination order, he conceded that the statutory provision had never been used to set aside a permanent neglect finding. 455 U.S. at 749 n. 1, 102 S.Ct. at 1392 n. 1, 71 L.Ed.2d at 603 n. 1.

Title 22 M.R.S.A. § 4056(1) provides:
1. Parent and child divested of rights. An order terminating parental rights divests the parent and child of all legal rights, powers, privileges, immunities, duties and obligations to each other as parent and child, except the inheritance rights between the child and his parent.

**13.** *See also Robert H.,* 393 A.2d at 1391 ("we hold that absent a showing of specific harm to the children, 'growing up in a so-called disadvantaged home is not a sufficient basis for coercive intervention.'")

**14.** With no evidence on the record of any action taken by the Maine Department during the April, 1980 to January, 1981 period, it is possible to conclude that the Department's decision to terminate was, in reality, made because it had difficulty locating Linda and because she did not immediately respond to the Maine Department when she received the second letter concerning reunification. Those events occurred by April, 1980.

The Commentary to the A.B.A. *Standards Relating to Abuse and Neglect* provide:
Too often under current practice, there is no direction or incentive for parents or agency to work towards return of the child. The court rarely, if ever, requires a plan and does not review the case to see what is being done. The pressures of agency workload, aggravated by inadequate staff and financing, are such that as long as a child in placement raises no problems, he/she will not get any attention. Dealing with the parents may be time-consuming and, according to the agency's priorities, unproductive. If a child is not having difficulty in placement, the

the difficult tasks that confront the Department. Considering, however, the extraordinary nature of a termination of parental rights, the Department must, prior to seeking termination, make the statutorily mandated effort to reunite the family. If those efforts fail, the Department must, at the termination hearing, show clearly and convincingly that it has made those efforts and that the parents "definitely gave up their parental interests ..." and that the situation is not likely to change.

The entry is

Appeal sustained.

Granting of the Petitions for Termination of Parental Rights reversed.

All concurring.

agency may consider it to be in the child's "best interest" to remain in placement, even if the child would now be safe in his/her own home. Therefore, no effort is made to work towards return. To be consistent with the underlying goals of these standards—that children's interests are generally best served

by assuring them a continuous safe home with their parents—it is imperative that any plan for removal include clear commitments by parents and agency to take the necessary action to return the child to a safe home. A.B.A. *Standards Relating to Abuse and Neglect* commentary at 132 (1977).