Jeffrey C. STONE

v.

**BOARD OF REGISTRATION IN MEDICINE.**

Supreme Judicial Court of Maine.
Argued Nov. 14, 1985.
Decided Jan. 3, 1986.

**10.** The Supreme Court in its affirmance did not reach the issue.

Bernstein, Shur, Sawyer & Nelson, John M.R. Paterson (orally), Portland, for plaintiff.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Joseph M. Kozak (orally), Augusta, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN, GLASSMAN, and SCOLNIK, JJ.

McKUSICK, Chief Justice.

This appeal, brought by the Board of Registration in Medicine (the "Board"), raises a single narrow question of statutory construction, the answer to which determines the proper disposition of the application for a license to practice medicine in Maine filed on March 2, 1984, by the appellee, Dr. Jeffrey Stone, a graduate of St. George's University Medical School in Grenada. That question is: Under the Medical Practice Act, 32 M.R.S.A. § 3271, as it existed between July 1982 and July 1984,[1] could a graduate of an unaccredited medical school outside the United States qualify to take the examination for licensure in Maine by obtaining a permanent certificate from the Educational Commission for Foreign Medical Graduates? The Superior Court answered the question in the affirmative, and so do we.

If the same question were asked as to an application for licensure prior to July 13, 1982, the answer would have been yes, without the slightest doubt, because section 3271 then provided in pertinent part:

> [A]ny foreign medical school graduate who has been evaluated by the Educational Commission for Foreign Medical Graduates and is a recipient of its permanent certificate ... shall be entitled to examination [by the Maine Board], and if found qualified by a majority of the members of the board ... shall be registered as a physician or surgeon in the State of Maine.

The complication arises from the fact that the 1982 regular session of the legislature amended section 3271, effective July 13, 1982, by adding the following identification of a person who was also to be entitled to take the examination for practice of medicine in Maine:

> "be evaluated by the Educational Commission for Foreign Medical Graduates *subsequent to July 1, 1984,* and receive a permanent certificate from the Educational Commission for Foreign [Medical] Graduates *subsequent to July 1, 1984* ...." P.L.1983, ch. 741, § 1 (emphasis added).

1. Effective July 25, 1984, 32 M.R.S.A. § 3271 was repealed and replaced in full. In addition to requiring a longer period of graduate education, the newly enacted section 3271 requires a graduate from an unaccredited medical school, such as the Grenada medical school, to

Any graduate . . . of a <u>foreign-char-tered medical school that meets the guide-lines established for accreditation by the Liaison Committee on Medical Education</u> . . . .

P.L. 1981, ch. 616, § 1 (new matter under-lined). That 1982 amendment did not de-lete or change in any way the verbal identi-fication of the preexisting categories of persons qualified to take the Maine medical examinations.[2] Nonetheless, the Board in the case at bar contends that we should read the newly inserted language to re-strict the preexisting section 3271 lan-guage, "any foreign medical school gradu-ate." Relying upon the Statement of Fact accompanying L.D. 2011[3] (which on enact-ment became the 1982 amendment of sec-tion 3271), as well as on various materials that the Board provided to the legislators who sponsored the bill, the Board argues that by virtue of the 1982 amendment a graduate of the Grenada medical school no longer fell into the category of "any for-eign medical school graduate."

### The Facts

A 1978 graduate of Bucknell University, Dr. Stone earned an M.D. degree from the Grenada medical school in 1982. He there-after received the permanent certificate of the Educational Commission for Foreign Medical Graduates (ECFMG), and he sat for the Federation Licensing Examination (FLEX) and passed that examination with a grade higher than the minimum required by the regulations of the Maine Board. Dr. Stone obtained a permanent license to practice in Virginia and a temporary license to practice in New York State. After one year of a two-year program of post-gradu-ate medical training in family practice at Albany Medical Center in Albany, New York, he was offered and signed a contract for a two-year residency in the Department of Family Medicine at Maine Medical Cen-ter in Portland. Thereupon he applied to the Maine Board, first, for a temporary education permit and, later (on March 2, 1984), for a permanent license to practice in Maine. After receiving the formal opinion of the Attorney General that the 1982 amendment did not bar anyone in Dr. Stone's circumstances from being licensed in Maine and later the diametrically oppo-site advice from a private law firm consult-ed by it, the Board decided that Dr. Stone was qualified for licensure in Maine under

---

2. The 1982 amendment of section 3271, P.L. 1981, ch. 616, § 1, appeared as follows in L.D. 2011 when considered and enacted by the legis-lature:

> Sec. 1. 32 M.R.S.A. § 3271, first sentence, as amended by P.L. 1981, c. 240, is further amended to read:
>
> Any graduate of a medical school in the United States or Canada designated as accred-ited by the Liaison Committee on Medical Education, <u>or of a foreign-chartered medical school that meets the guidelines established for accreditation by the Liaison Committee on Medical Education,</u> or any foreign medical school graduate who has been evaluated by the Educational Commission for Foreign Medical Graduates and is a recipient of its permanent certificate, or has successfully completed an academic year of supervised clinical training under the direction of a medical school accred-ited by the Liaison Committee on Medical Edu-cation and who has spent at least 12 months in a graduate educational program approved by the ~~Liaison Committee~~ <u>Accreditation Council</u> on Graduate Medical Education, the Canadian Medical Association or the Royal College of

Physicians and Surgeons of Canada, upon pay-ment of a fee of ~~$175~~ <u>$100 plus the current cost of the examination,</u> shall be entitled to exami-nation, and if found qualified by a majority of the members of the board and a majority of the members of the board finds that there exists no cause as set forth in section 3282 which would be considered grounds for suspension or revo-cation of a license, shall be registered as a physician or surgeon in the State of Maine.
> L.D. 2011 (110th Legis. 1982) (new language un-derlined; deleted language stricken).

3. The Statement of Fact accompanying the 1982 amendment read in full as here pertinent:

> According to a General Accounting Office (GAO) report to Congress, a number of recent-ly established Caribbean medical schools with recruiting offices in the United States (for-eign-chartered) have inadequate clinical edu-cation facilities. This bill provides for accept-ing these students only if their school meet established guidelines for accreditation.
> L.D. 2011, Statement of Fact (110th Legis. 1982).

the 1982 amendment only if the Grenada medical school met the accreditation guidelines established by the Liaison Committee on Medical Education. When the Board was delayed in obtaining information from the Grenada medical school to determine whether it met those guidelines, the Board informed Dr. Stone that it was "unable to grant licensure to [him] at this time."

Pursuant to the Administrative Procedure Act, 5 M.R.S.A. § 11002 (1979), Dr. Stone sought judicial review of the Board's action in the Superior Court (Kennebec County). That court reversed and remanded to the Board with instructions that Dr. Stone's application filed on March 2, 1984, be acted upon on the basis that he was a "foreign medical school graduate" within the meaning of section 3271 as it existed on that date. We affirm that disposition.

### Interpretation of Section 3271 as of March 2, 1984

As on all questions of statutory construction, "[t]he starting point ... must be the language of the statute itself."[4] *State v. Vainio,* 466 A.2d 471, 474 (Me.1983). The Act (section 3271) provided in March 1984 that any of the following persons was eligible to take the examination for medical licensure in Maine:

Any graduate of a medical school in the United States or Canada designated as accredited by the Liaison Committee on Medical Education, *or of a foreign-chartered medical school that meets the guidelines established for accreditation by the Liaison Committee on Medical Education, or any foreign medical school graduate who has been evaluated by the Educational Commission for Foreign Medical Graduates and is a recipient of its permanent certificate, or has successfully completed an aca-* demic year of supervised clinical training under the direction of a medical school accredited by the Liaison Committee on Medical Education and who has spent at least 12 months in a graduate educational program approved by the Accreditation Council on Graduate Medical Education, the Canadian Medical Association or the Royal College of Physicians and Surgeons of Canada ....

(Emphasis added) Thus, on the date of Dr. Stone's application, the Act (section 3271) provided four alternative methods by which an applicant might satisfy the educational prerequisites for licensure:

1) graduation from a medical school located in the United States or Canada accredited by the Liaison Committee on Medical Education; or

2) graduation from a foreign-chartered medical school that meets the guidelines for accreditation established by the Liaison Committee on Medical Education; or

3) graduation from a foreign medical school,[5] and evaluation by the Educational Commission on Foreign Medical Graduates and receipt of that Commission's permanent certificate; or

4) graduation from a foreign medical school,[6] and completion of an academic year of supervised clinical training under the direction of a medical school accredited by the Liaison Committee on Medical Education.

The 1982 amendment to the Act, on which the Board based its decision, added the second provision concerning graduates of "foreign-chartered medical schools." But that second provision did nothing to restrict the scope of the third and fourth provisions pertaining to foreign medical school graduates in general. To the contrary, a straightforward reading of the amendment

---

4. Judge Henry Friendly has reminded us of Justice Frankfurter's three rules of statutory interpretation:

(1) Read the statute; (2) read the statute; (3) read the statute!

H. Friendly, *Benchmarks* 202 (1967).

5. Section 3271 also required a graduate of a foreign medical school to spend at least 12 months in an approved graduate educational program.

6. *See* n. 5 above.

shows that it had the opposite net effect: It opened a new avenue by which graduates of certain foreign medical schools (namely, schools satisfying accreditation standards) would meet the Act's educational prerequisites without the necessity of their individually obtaining an ECFMG certificate or their individually completing additional clinical training.

Despite the plain language of the Act, the Board maintains that the legislature intended the 1982 amendment to bar certain graduates of nondomestic medical schools from the practice of medicine in Maine unless their medical schools met accreditation standards. The Board argues that the use of the adjective "foreign-chartered" to designate an apparently distinct subset of "foreign" medical schools creates ambiguity in the Act and thus warrants examination of the legislative history to ascertain the purpose of the 1982 amendment. We reject this argument. We cannot depart from the language of the Act because there is no ambiguity in Dr. Stone's status as a "foreign medical school graduate." *See Perry v. Hartford Accident & Indemnity Co.,* 481 A.2d 133, 138 (Me.1984). "In construing a statute our duty is to give effect to the intent of the Legislature as evidenced by the language of the statute. If the meaning of the language is plain, we must interpret the statute to mean exactly what it says." *Concord General Mutual Insurance Co. v. Patrons-Oxford Mutual Insurance Co.,* 411 A.2d 1017, 1020 (Me.1980). *See also Opinion of the Justices,* 460 A.2d 1341, 1345 (Me.1982); *National Council on Compensation Insurance v. Superintendent of Insurance,* 481 A.2d 775, 779 (Me. 1984). Because neither of these terms "foreign-chartered" and "foreign" is expressly defined, they "must be accorded their plain and common meaning and should be construed according to their natural import." *Brousseau v. Maine Employment Security Commission,* 470 A.2d 327, 330 (Me.1984); *Town of Arundel v. Swain,* 374 A.2d 317, 320 (Me.1977). In any everyday lexicon, Dr. Stone is "a foreign medical school graduate." Since "the words of [the] statute are clear and unambiguous" in relation to Dr. Stone's classification as a foreign medical school graduate, "they should be strictly construed, and we need not look beyond them to the purpose of the legislation." *Concord General Mutual Insurance Co.,* 411 A.2d at 1020. *See also Seven Islands Land Co. v. Maine Land Use Regulation Commission,* 450 A.2d 475, 481 n. 9 (Me.1982). The fact that Dr. Stone is also, in any everyday lexicon, a "graduate of a foreign-chartered medical school" does not at all detract from his entitlement to pursue his licensure in Maine under either category. Because the language of the Act does not evince any intent to depart from the ordinary meaning of "any foreign medical school graduate," we can find no principled basis for excluding Dr. Stone from that classification. He therefore is entitled to licensure, provided that he fulfills the other requirements set forth in the Act.[7]

Even if the court were to look at extrinsic materials in an attempt to determine legislative intent, the Board would still not prevail on its present appeal. The Statement of Fact that accompanied L.D. 2011, quoted in note 3 above, is "a proper ... aid in ascertaining the legislative purpose and intent" in enacting the 1982 amendment, *Franklin Property Trust v. Foresite, Inc.,* 438 A.2d 218, 223 (Me.1981); and it is the *only* such aid available to us in the case at bar. Other materials, such as those apparently furnished by the Board to the named sponsors of L.D. 2011 were not reasonably available to the other legisla-

---

7. Those additional requirements include spending "at least 12 months in a graduate educational program approved by the Accreditation Council on Graduate Medical Education, the Canadian Medical Association or the Royal College of Physicians and Surgeons of Canada" and being found otherwise fit for licensure in that "there exists no cause as set forth in section 3282 which would be considered grounds for suspension or revocation of [his] license." *See* n. 2 above.

tors or relied upon by them and therefore cannot be treated as part of the amendment's legislative history.[8] The Statement of Fact, the Board now argues, provides us with a specialized definition of "foreign-chartered medical schools," namely, "recently established Caribbean medical schools with recruiting offices in the United States." We should, the Board further contends, interpret section 3271 as amended in 1982 to accomplish what the Statement of Fact said the bill accomplished:

> This bill provides for accepting these students [of "recently established Caribbean medical schools with recruiting offices in the United States"] only if their schools meet established guidelines for accreditation.

Accepting *arguendo* that the sponsors of L.D. 2011 indeed did have in mind such an unconventional and limited definition of "foreign-chartered medical schools" and indeed did want to impose accreditation of the schools themselves as the only way the graduates of those schools could be licensed in Maine, the undeniable fact remains that the sponsors' drafting utterly and patently failed to carry out their assumed intent. Obviously, to carry out that intent, any competent draftsman[9] would have included in L.D. 2011 itself a specialized definition of "foreign-chartered medical schools," in order to narrow the definition of that term, which in its ordinary, everyday meaning refers to all medical schools incorporated outside the United States. Also, the draftsman either would have completely deleted the third (and perhaps the fourth) method of satisfying the educational requirement for licensure in Maine or would have excepted from the foreign medical schools whose graduates could qualify by obtaining an ECFMG certificate the "foreign-chartered medical schools" as specially defined. Whatever L.D. 2011's sponsors had in mind, they used language that *expanded* rather than *narrowed* the educational routes to Maine licensure. It was the statutory language, plain on its face, that the legislators voted to enact and the Governor signed, not the Statement of Fact. "[T]he intent of the legislature as divined from the statutory language itself controls," *Raymond v. State*, 467 A.2d 161, 164 (Me.1983), and must override inconsistent extrinsic materials.[10]

■ As the Superior Court concluded, "A different meaning cannot be created out of whole cloth from legislative history. If the legislature intends to qualify and limit general terms which have a plain meaning, they must do it by adopting definitions and

---

**8.** For extrinsic material to constitute legislative history, the proponent must show that the material was widely available and generally relied upon by legislators considering a bill. "To serve as external context material must be (1) relevant; (2) reliable and reliably revealed; (3) reasonably available to the [legislative] audience (that is, shared by author and audience); [and] (4) taken into account (that is, relied on), as constituting part of the communication, by both author [of the bill] and [legislative] audience." Dickerson, *Statutory Interpretation: Dipping into Legislative History*, 11 Hofstra L.Rev. 1125, 1130 (1983). In the case at bar only the Statement of Fact fits those requirements.

**9.** Professor Dickerson has passed along the suggestion "that, when interpreting a statute, it is useful to reverse the drafting process." Dickerson, *Obscene Telephone Calls: An Introduction to the Reading of Statutes*, 22 Harv.J. on Legis. 173, 182 (1985).

**10.** Both parties claim support for their positions from the 1984 repeal of the Act and replacement with completely new criteria for screening applicants who graduate from nondomestic medical schools. *See* n. 1 above. In *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n*, 450 A.2d 475, 481 n. 9 (Me.1982), we stated that "post-enactment comments are not legally cognizable legislative history." We repudiate any rule of statutory construction that calls for examination of a subsequent enactment as a method of divining the legislative intent of a prior statute. As Professor Dickerson has explained, "Post-enactment developments should be disregarded for purposes of cognition, simply because at enactment they were taken into account by neither the authors of the statute nor its [legislative] audience. The problems of relevance, reliability, and availability also persist, often in greater degree, even where they relate only to ulterior purpose." *Statutory Interpretation*, 11 Hofstra L.Rev. at 1133.

limiting amendments into the law—not by policy statements in legislative history." To depart from the controlling text of section 3271 in search of an alternative interpretation would amount to rewriting the law enacted by the legislature.

 Considerations of common fairness in the administration of licensing and other regulatory systems buttress our reading of the 1982 amendment. Applicants like Dr. Stone, attempting to plan their educational programs to conform to statutory mandates, rely on the plain and ordinary meaning of the medical licensing law. They ought to be able to take the Act at its word because they do not have any practical way of knowing more than what a statute itself says. *See* R. Dickerson, *The Interpretation and Application of Statutes* 11–12 (1975) (constitutional assumption of reasonable availability of knowledge of what the law is). Neither facial ambiguity nor facial absurdity forewarned members of the public that they must look elsewhere for the "true" meaning of the Act. "[S]tandards which a statute sets out to guide the determinations of administrative bodies must be sufficiently distinct so that the public may know what conduct is barred [or demanded] and so that the law will be administered according to the legislative will." *In re Spring Valley Development*, 300 A.2d 736, 751 (Me.1973). The key "assumption [is] that the law must provide reasonable and intelligible standards to guide ... future conduct." *Shapiro Bros. Shoe Co., Inc. v. Lewiston-Auburn S.P.A.*, 320 A.2d 247, 253 (Me.1974). Thus, when interpreting statutes, the court strives to "giv[e] statutory language that construction which men of 'common intelligence would readily ascribe' thereto." *Union Mutual Life Insurance Co. v. Emerson*, 345 A.2d 504, 507 (Me.1975) (quoting *State v. Shaw*, 343 A.2d 210, 213 (Me.1975)). To read section 3271 contrary to its plain meaning and thus exclude Dr. Stone from being treated as a "foreign medical school graduate" would be to deprive the Act of "reasonable and

intelligent standards to guide ... future conduct."

The entry is:

Judgment affirmed.

All concurring.