## In re CHRISTOPHER J.

Supreme Judicial Court of Maine.

Argued Jan. 22, 1986.

Decided Feb. 26, 1986.

Sheila J. Fine, (orally), Ogunquit, for plaintiff.

James Eastman Smith (orally), Sr. Asst. Atty. Gen., Human Services Section, State House Station 11, Augusta, for defendant.

Michelle Robert (orally), Biddeford, Guardian Ad Litem.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, and SCOLNIK, JJ.

McKUSICK, Chief Justice.

Sybil C., mother of Christopher J., appeals a judgment of the District Court (Biddeford) terminating her parental rights pursuant to 22 M.R.S.A. § 4055 (Supp. 1985–1986). Her main contention on appeal is that the record does not contain the quantum of evidence required both constitutionally and statutorily for termination of her parental rights.

Christopher was born on August 20, 1971, to Sybil, then a 15-year-old unwed high school student. Sybil and her family decided that adoption was in the best interest of the baby. Soon after his birth, however, it became apparent that Christopher had serious medical problems that would prevent his immediate adoption. Therefore, on September 23, 1971, Sybil voluntarily placed Christopher in the protective custody of the Maine Department of Health and Welfare, now renamed the Department of Human Services (Department).

The Department placed Christopher in the foster care of Mrs. M. when he was 11 weeks old. He has remained in her home continuously to the present, and she wishes to adopt him. Christopher has a liver condition called Alpha I Anti-Trypsin Deficiency, which has led to cirrhosis of the liver and has required him to undergo a series of surgeries and hospitalizations. At the time the District Court entered its order on October 11, 1985, Christopher was waiting for an urgently needed liver transplant.[1] Mrs. M. has cared for Christopher throughout all these physical difficulties. When Christopher was one year old, she told the Department that she wished to adopt him, and repeated that request several times thereafter. Mrs. M.'s income, however, was insufficient to pay for Christopher's extraordinary medical expenses, and it was not until March of 1984 that the Department had the funds available to provide for a subsidized adoption pursuant to 19 M.R.S.A. § 541 (Supp.1985–1986). For that reason Christopher has remained in Mrs. M.'s foster care for over 14 years.

Sybil has had no contact with Christopher since he was an infant. When he was two years old he became seriously ill and was expected to die. Believing that she was acting in Sybil's best interest, Sybil's mother told her that Christopher had died. Sybil remained under the impression that Christopher was dead until the Department contacted her on May 2, 1983, regarding a new federally required judicial review of Christopher's foster care. The Department had never attempted to contact Sybil before that time. Sybil immediately told the Department that she wanted to meet Christopher. However, because of Christopher's physical and mental condition, his doctors advised against such a meeting. Sybil complied with their recommendation. On July 2, 1984, she filed a petition for change of custody in District Court.

In June 1985 the Department petitioned for termination of Sybil's parental rights pursuant to 22 M.R.S.A. § 4055 so that Christopher could be adopted by Mrs. M.

---

1. He received the liver transplant on December 11, 1985, while this appeal was pending.

Section 4055, in pertinent part, requires that before termination may be ordered the District Court must find, based on clear and convincing evidence, that:

(a) Termination is in the best interest of the child; and

(b) Either:

(i) The parent is unwilling or unable to protect the child from jeopardy and these circumstances are unlikely to change within a time which is reasonably calculated to meet the child's needs; [or]

(ii) The parent has been unwilling or unable to take responsibility for the child within a time which is reasonably calculated to meet the child's needs....

22 M.R.S.A. § 4055(1)(B)(2)(a) & (b) (Supp. 1985–1986). *See also Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982) (due process requires proof by clear and convincing evidence before parental rights may be terminated).

The District Court found that Sybil is *unable to protect Christopher from jeopardy* and that the circumstances are unlikely to change within a time that is reasonably calculated to meet his needs and also that she is *unable to take responsibility* for Christopher within a time that is reasonably calculated to meet his needs. The District Court also found it to be in the best interest of Christopher that Sybil's parental rights be terminated. Sybil argues that those findings are not supported by clear and convincing evidence and that they are clearly erroneous. "Where clear and convincing evidence is required, the appropriate standard of appellate review is 'whether the factfinder could reasonably have been persuaded that the required factual finding was or was not proved to be *highly probable.*'" *In re John Joseph V.*, 500 A.2d 628, 629 (Me.1985) (quoting *Taylor v. Commissioner of Mental Health*

*and Mental Retardation*, 481 A.2d 139, 153 (Me.1984) (emphasis added)). The District Court's finding that the evidence before it was clear and convincing "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the court to judge the credibility of the witnesses." M.D.C.Civ.R. 52(a); *see also In re Chesley B.*, 499 A.2d 137, 138–39 (Me.1985).

After a careful review, we hold that the record before the District Court did indeed contain the clear and convincing evidence required to support its findings of fact. The expert testimony before the court fully supports the court's conclusion that Sybil is *unable* to protect Christopher from jeopardy and that these circumstances are unlikely to change within a time reasonably calculated to meet his needs.[2] "[T]he word 'unable' [is] synonymous with incapable, and, as employed in its relevant statutory context, mean[s] that a parent is incapable, *for whatever reason*, to [protect his or her child from jeopardy]." *In re John Joseph V.*, 500 A.2d at 630 (emphasis added). The word "jeopardy" is defined by statute to mean "serious abuse or neglect, as evidenced by ... serious harm or threat of serious harm." 22 M.R.S.A. § 4002(6)(A) (Supp.1985–1986). "'Abuse or neglect' means a threat to a child's health or welfare by physical or mental injury or impairment, ... deprivation of essential needs or lack of protection from these, by a person responsible for the child." 22 M.R.S.A. § 4002(1) (Supp.1985–1986). "Serious harm" is defined as "serious injury" or "serious mental injury or impairment, evidenced by severe anxiety, depression or withdrawal, untoward aggressive behavior or similar serious dysfunctional behavior." 22 M.R.S.A. § 4002(10)(A) & (B) (Supp. 1985–1986). In determining a time reasonably calculated to meet the child's needs,

---

**2.** Because 22 M.R.S.A. § 4055(1)(B)(2)(b) in pertinent part requires that the parent be unwilling or unable (i) to protect the child from jeopardy *or* (ii) to take responsibility for the child, we need only discuss the findings of the District Court with regard to one of those requirements in order to determine whether there existed clear and convincing evidence to terminate Sybil's parental rights.

"the time frame which the court is gauging must be seen from the child's perspective." L.D. 2166, Statement of Fact (111th Legis. 1984). Using these definitions, the District Court could reasonably have been persuaded that it was proved to be highly probable that Sybil is unable to protect Christopher from jeopardy and that these circumstances are unlikely to change within a time that is reasonably calculated to meet his needs. *See In re Dean A.*, 491 A.2d 572 (Me.1985) (severely traumatized child would suffer serious psychological injury if he were taken from his foster mother and returned to his natural mother).

The evidence shows that Christopher has a history of dealing with stress by eating foods prohibited on his strict medical diet. These diet deviations cause serious medical problems that jeopardize his health and that have in the past put him back into the hospital. Dr. David DeMaso, assistant clinical director of the Department of Psychiatry at the Judge Baker Guidance Center in Boston and psychiatric consultant to Christopher's liver transplant team, interviewed Christopher in 1984 and again in 1985. During those interviews Christopher told him that he considered Mrs. M. his "actual mother" and that he wanted to be adopted by his foster family. Furthermore, Christopher told him that he did not wish to see his biological mother. Based on the interplay between Christopher's emotional and physical health, Dr. DeMaso testified that Christopher would be in jeopardy if Sybil's parental rights were not terminated:

I think he would be in jeopardy for a couple reasons. I think, one, this youngster, particularly based on my contacts with him, views his foster mother as his actual mother, as the mother that he's known all his life. And I think the trauma of being taken away from that mother would be quite emotionally stressful for this youngster. I think the second part that concerns me is that with this increased stress, and with the history of behaviorally having great difficulty at times complying with various medical regimens, that this could directly affect compliance, if he gets upset, around his liver illness; both pre-transplant, with his need for great compliance around diet and medication; and also, post-transplant, because it's—again, it's not a procedure that's over in one week. It's a procedure that leads to an on-going process, and so I was concerned. One of the significant concerns in doing transplantations now is the issue of compliance; such that physicians on the transplant team want that to be the primary—one of the primary psychological assessments. If they have concerns about compliance, that's one of the things they worry about when they do the liver [transplant], because so much is required of the patient and their family.

Furthermore, the District Court could reasonably find that these circumstances are unlikely to change within a time that is reasonably calculated to meet Christopher's needs. Dr. DeMaso testified that Christopher critically needs now and in the future significant stability and a sense of belonging to his family—something that Sybil is not able to provide.

Dr. James Maier, a Portland psychiatrist, also concluded that Sybil could not protect Christopher from jeopardy. Dr. Maier made an independent evaluation of Christopher, his foster mother, and his biological mother pursuant to an order of the District Court and an agreement by the parties. Dr. Maier testified:

I think the jeopardy to Chris, were he to be taken out of his foster home, would be enormous. In effect [it would be disastrous]. In effect, it's a kind of a sword of Solomon hanging over his head, to have to face the possibility of being disrupted and taken away from his foster family, which is the only family that he's known and grown up with, at a time when the strongest possible psychological stability for Chris and for the family system that he's operating in, will be necessary to his survival from this surgery. It would seem to be extremely unwise to even contemplate a change in

custody.... The jeopardy that I would foresee would be that, were parental rights not terminated, the possibility of some action by [Sybil] or her lawyer, which Chris in some way might get wind of, could potentially threaten his emotional stability and make him more anxious, at a time when he can ill afford to have any additional stress in his life.

Dr. Maier saw jeopardy to Christopher's "medical management" if the boy became aware of Sybil's efforts to reintroduce herself into his life. He had further explained his view as follows:

I felt that a disruption of Chris' life by the introduction of a natural parent whom Chris himself had shown no spontaneous interest in getting in touch with, at a time when his physical health and emotional health were still precarious, might cause some real complications or problems, not only for Chris, but for the family system that he was living in. And I felt that this, in turn, could have consequences that would be deleterious to his health in the form of, perhaps, his anxiety taking a form of decreased compliance with taking medication or with his diet, or other kinds of behavior which could jeopardize his condition.

Finally, letters from Christopher's gastroenterologist, Dr. Richard Grand, and his pediatrician, Dr. Patricia Adams, were admitted in evidence. Dr. Grand wrote:

Through all of [Christopher's medical problems], numerous visits to me and to Dr. Adams, as well as twelve hospitalizations at the Children's Hospital and several in New Hampshire, Mrs. [M.] has been remarkably supportive, loving, and devoted. She has spent numerous hours in arranging for his home medical care, his counseling program in school, his special classes and other special needs. She is accustomed to dealing with his emotional lability which is secondary to his liver disease. In addition, she has effectively taught Christopher to join in family activities so that he feels quite comfortable with the other children at home.

Indeed, he considers himself one of the family.

At this point, it would be extremely disruptive, damaging, and irresponsible to allow him to be removed from this supportive environment. His long-term survival depends upon continued devotion to all of the details of his medical management, as well as the security of people who know him well and are accustomed to his habits and behavior. Mrs. [M.] has established an outstanding relationship with Christopher and it would be a great mistake to interfere with that relationship now.

Christopher should remain with Mrs. [M.]. From my point of view, there is no alternative.

And Dr. Adams wrote:

Mrs. [M.] is so attuned to Chris' problems, how to interpret them, and what to do when he has one, I am sure she is responsible for him doing as well as he has done over the past years. I feel that to remove Chris from this environment he considers home, and has proved to be a good situation for him, would be to court disaster, both emotionally and physically.

The expert testimony also showed that the termination order is in Christopher's best interests. Dr. DeMaso testified about the effects of the liver transplant on Christopher:

[T]he liver transplantation process is a quite involved and quite stressful process. It's not a simple replacement of the liver and everything is all over. It's an ongoing process that's actually lifelong, even if it's successful, with longtime compliance of medication. So it doesn't mean that suddenly that Christopher is suddenly all better in that sense.... So that we really want the child and his family in as optimal an emotional state as we possibly can when they go through this procedure.

Based on his interviews with Christopher, Dr. DeMaso recommended that Chris-

topher be adopted by Mrs. M. as soon as possible:

> I strongly felt Chris viewed his foster home as his actual home, and my impression was that this home appeared caring and nurturing, and had, indeed, gone through [his] long medical course [of treatment with him]. And I thought that adoption should—I strongly endorse adoption as a way of providing this youngster with some more sense of being there. And to do it as soon as possible.

Gabrielle Brenninkmeyer, a senior social worker at the Judge Baker Center who evaluated Christopher, Mrs. M., and Sybil in conjunction with Dr. DeMaso at the request of the parties, testified that she too recommended adoption as soon as possible:

> I think it's important at this time ... [be]cause I believe that any child needs to know where he belongs and where he's going to grow up. And I think in Christopher's situation, it becomes even more urgent, given his medical problems.

Finally, Dr. Maier testified:

> I would concur with the recommendations of all of the professionals that I have read about; that, legally, adoption be allowed to take place as soon as possible, so that Chris can have that psychological stability going into life-threatening surgery.

This evidence makes it highly probable that termination of Sybil's parental rights is in Christopher's best interests in order to give him the emotional stability necessary to cope with a liver transplant and its long-term follow-up treatment.

Based on the testimony and letters of the experts, the District Court could reasonably have been persuaded that it was proved to be highly probable that termination of Sybil's parental rights is in Christopher's best interests, that Sybil is unable to protect Christopher from jeopardy, and that the circumstances are unlikely to change within a time that is reasonably calculated to meet his needs. The record shows that Christopher needs emotional stability for an extended period in order to survive life-threatening medical problems and the aftermath of a liver transplant. Sybil, however, is unable to provide this stability within the time that Christopher needs it because she, although through no fault of her own, has had no contact with him since his infancy. The findings of the District Court are based on clear and convincing evidence and therefore satisfy the requirements of the Due Process Clause of the United States Constitution and the provisions of 22 M.R.S.A. § 4055.

Sybil's remaining argument on appeal is that 22 M.R.S.A. § 4055(3) (Supp.1985–1986) requires Christopher's written consent before the court may terminate her parental rights. Section 4055(3) provides, "The court shall not order termination [of parental rights] if the child is at least 14 years old and *objects to the termination."* (Emphasis added) Sybil contends that because the adoption statute, 19 M.R.S.A. § 532 (1981), requires children 14 years of age and older to consent in writing before they are adopted, the parental rights termination statute must also be read to contain such a requirement. The plain language of section 4055(3), however, contains no mention of such a requirement. "In construing a statute our duty is to give effect to the intent of the Legislature as evidenced by the language of the statute. If the meaning of the language is plain, we must interpret the statute to mean exactly what it says." *Stone v. Board of Registration in Medicine,* 503 A.2d 222, 226 (Me.1986) (quoting *Concord General Mutual Insurance Co. v. Patrons-Oxford Mutual Insurance Co.,* 411 A.2d 1017, 1020 (Me.1980)). Section 4055(3) merely reflects the desire of the legislature to assure that no termination of parental rights would be ordered against the will of a child over the age of 14. The language of section 4055(3) is carefully chosen to protect against the limited special situation where a child of the age of discretion does register an objection. It, however, does not require the court affirmatively to ask the child whether he

objects, and, *a fortiori*, does not require the written consent that is explicitly required in the adoption statute, 19 M.R.S.A. § 532.

The entry is:

Judgment affirmed.

ROBERTS, WATHEN, and GLASSMAN, JJ., concurring.

SCOLNIK, Justice, dissenting.

Because I believe that the District Court could not reasonably have been persuaded that it was highly probable that the biological mother was unable to protect her son from jeopardy, I respectfully dissent.

The flaw in the Court's analysis, in my view, is its mistaken evaluation of the expert testimony quoted at length in the opinion. In concluding that the record supports a finding of jeopardy, the Court substantially relies on statements from medical experts that *removal* from the foster parents' home would jeopardize the child. It quotes the testimony of Dr. DeMaso, who stated: "I think the trauma *of being taken away* from [the foster] mother would be quite emotionally stressful for this youngster." (emphasis added). The opinion also refers to the testimony of Dr. James Maier who similarly testified to the effects of removal. He said: "I think the jeopardy to Chris, *were he to be taken out of his foster home*, would be enormous. In effect [it would be disastrous]. In effect, it's a kind of a sword of Solomon hanging over his head, to have to face the possibility of being disrupted *and taken away* from his foster family.... It would seem to be extremely unwise to even contemplate a *change in custody*." (emphasis added). Again, the opinion includes excerpts from letters of Drs. Richard Grand and Patricia Adams. Dr. Grand wrote: "[I]t would be extremely disruptive, damaging and irresponsible to allow him *to be removed* from this supportive environment.... Christopher *should remain* with Mrs. [M.]. From my point of view, there is no alternative." (emphasis added). Dr. Adams wrote: "I

feel that *to remove Chris from this environment he considers home* ... would be to court disaster both emotionally and physically." (emphasis added).

Since a denial of a petition for termination need not in any way affect child custodial arrangements or arrangements to visit with the birth parent, away from the foster home, evidence of the effects of removal is irrelevant to this parental termination proceeding. *See In re Sabrina M.*, 460 A.2d 1009, 1016 (Me.1983) ("The child's interest in safety does not arise in a termination proceeding because, under our statutory structure, when such a proceeding commences, the child is not in a dangerous environment and [a] ... failure to terminate parental rights does not return the child to a dangerous environment; *rather, the child remains with his present custodian.*") (emphasis added). The Court's analysis is erroneously based on an assumption that absent a termination of parental rights, protective measures are unavailable to prevent removal from the foster home or stability threatening visitation. The Department is free through the mechanism of judicial review of the custody order to request the imposition of whatever conditions are deemed necessary to ensure that reintroduction efforts are undertaken at the child's foster home and under close supervision of appropriate personnel. *See* 22 M.R.S.A. § 4038(2), (4) (Supp.1985–1986). Accordingly, the Court's reliance on evidence of the effects of removal distorts its review of the District Court's finding.

The remaining expert testimony attempting to establish a threat of harm to the child if the natural mother were reintroduced into the child's life is so vague and speculative that the District Court could not reasonably have been persuaded that the natural mother was unable to protect her child from jeopardy. Again, the Court leans heavily on the testimony of Dr. Maier who stated that: "The jeopardy that I would foresee would be that, were parental rights not terminated, the *possibility of* some action by [Sybil] or her lawyer, which

Chris in some way might get wind of, could potentially threaten his emotional stability and make him more anxious, at a time when he can ill afford to have any additional stress in his life." (emphasis added). He went on to say that a disruption of the child's life by the introduction of the natural parent *"might cause* some real complications or problems [for Chris]. ... And ... this, in turn, *could have consequences* that would be deleterious to his health in the form of, *perhaps,* his anxiety taking a form of decreased compliance with taking medication or with his diet, or other kinds of behavior which *could jeopardize* his condition." (emphasis added). The remaining quoted portions of the expert testimony relate to the best interests of the child. I concede that this evidence clearly supports a finding that termination would be in the best interests of the child. Because this criterion, however, must not be examined until it is first determined that the evidence clearly and convincingly demonstrates that the natural mother is unable to protect Christopher from jeopardy within a time reasonably calculated to meet the child's needs, *In re Shannon R.,* 461 A.2d 707, 712 (Me.1983), it is imperative that the best interests issue not unconsciously color the Court's judgment on the ability-to-protect question.

The State can point to no evidence of harmful results from any attempts at supervised contact between mother and child. The record does show that the mother would be entirely cooperative and would abide by any restrictions as to time, place, frequency and duration of any proposed contacts. No evidence of a deficiency in her parenting abilities has been presented. There is no evidence whatsoever demonstrating that steps short of this extreme action could not be undertaken to accomplish the protection of all interests involved. *Cf. In re Daniel C.,* 480 A.2d 766, 773 (Me.1984) (Violette, J., dissenting) ("The break-up of the family unit should, however, be a last resort, when all else has failed.").

Rather than attempting to design a statutorily mandated plan during the fourteen years the child has been in the Department's custody, *see* 22 M.R.S.A. § 4041(1) (Supp.1985–1986), the State pursued a policy of making no effort whatsoever to expose Christopher to his natural parent. More shocking is the fact that when the Department learned in 1978 that Sybil believed Christopher was dead, it did absolutely nothing to correct this erroneous belief. Amazingly, one of the caseworkers for the Department testified that she believed "it was possible to complete an adoption without notifying the natural parents." Instead of making any attempt to inform Sybil that her child was alive, the Department let the natural bonding between Christopher and his foster mother continue to be enhanced and now, ironically, argues that in order not to interfere with the stability that that bonding promoted, termination is required. *Compare In re Daniel C.,* 480 A.2d at 773 (Violette, J., dissenting) ("The department could, by adopting a policy of doing nothing and letting nature run its course, create the inexorable result that the majority of these cases would end in the termination of parental rights."). While the termination statute focuses on the conduct of the parent rather than the shortcomings of the Department, the Department's egregious nonfeasance is a factor to be considered in evaluating the parent's conduct to determine whether there is clear and convincing evidence that Sybil is unable to protect her son from jeopardy. *In re Daniel C.,* 480 A.2d at 771.

"Few forms of state action are both so severe and so irreversible" as a decision terminating parental rights. *Santosky v. Kramer,* 455 U.S. 745, 759, 102 S.Ct. 1388, 1397–98, 71 L.Ed.2d 599 (1982), *quoted in In re Shannon R.,* 461 A.2d at 715. The clear and convincing evidentiary standard is required in these cases in part to force states to present sufficient proof of their allegations rather than to allow decisions to be made solely on the basis of the child's best interests as perceived by judges.

*Santosky v. Kramer*, 455 U.S. at 769, 102 S.Ct. at 1403.

I conclude that the District Court was clearly erroneous in finding that the evidence was sufficiently persuasive as a matter of law to meet the required evidentiary standard. Testimony couched in terms of "possibility," "could potentially threaten," "might cause," "could have consequences" or "could jeopardize," is clearly not the kind of clear and convincing evidence required to show that a mother is unable to protect her son from jeopardy.

I would vacate the order and remand to the District Court with instructions to deny the petition to terminate parental rights.