## 76501. IN THE INTEREST OF R. E. C. et al.
### (369 SE2d 323)

DEEN, Presiding Judge.

This appeal is from an order of the Juvenile Court of Cobb County terminating the parental rights of appellants in their two young daughters.

In his order, the trial judge noted that a termination petition was filed on September 26, 1985, and that after a trial, the court had terminated the parental rights of appellants in their two children. A no-

tice of appeal to this court was filed and the case was docketed, but the parties consented to the grant of a new trial, and this court allowed the appeal to be withdrawn. The new trial was held on October 2, 1987, and it was agreed between the parties that all testimony and evidence presented in the 1985 trial be stipulated as evidence in the new trial. In addition, both sides offered further testimony to support their positions.

The children in question, G. M. C. and R. E. C., were born on October 14, 1982, and August 19, 1984, respectively. The parents were married in January 1980 and divorced in October of 1981. They reunited shortly thereafter and held themselves out as husband and wife. They separated again in April 1987 and reunited eight days before trial. In addition to the two children who are the subjects of this proceeding, the couple had another daughter, C. L. C., born April 23, 1980, who was placed in protective custody by the Cobb County Police when she was six months old upon allegations of abandonment and medical neglect. In May of 1982, the Cobb County Department of Family and Children Services filed a petition to terminate appellants' parental rights in the child. A few days later they consented to the termination.

In April of 1983, when G. M. C. was six months old, the DFCS received complaints about her care, and in December the parents were ordered by the juvenile court to comply with certain terms and conditions regarding her care. They did not comply, and the trial transcript of the first termination trial contains a caseworker's testimony as to the incredibly filthy conditions under which the child was kept and the extreme neglect to which she was subjected. Her little body was covered with cradle cap, sores and bruises. She was discovered clothed only in a diaper in 45°F. weather, and was very lethargic. The court ordered that her custody be temporarily placed in the DFCS. In May of 1984, she was returned by the Department to her parents subject to their compliance with conditions contained in the court order. The department offered the parents homemaker services, but the offer was declined. Thereafter, a caseworker was initially refused entry into their apartment because it was so filthy. The caseworker made appointments for the child to have a medical appraisal by the Health Department, but the parents did not keep the appointments, although admitting that they had transportation.

After the birth of R. E. C., the department received a protective services referral from a social worker at the hospital. The child was born with a high level of bilirubin, which could cause brain damage if left untreated. The doctor wanted to keep the baby in the hospital an extra day for observation, but the parents assured him that they would bring her back for repeat tests. When they did not return, the doctor attempted to locate them. They were finally located later that

night at a Waffle House. When the baby was finally returned to the hospital, her bilirubin level was so high that she needed to be admitted, but the parents signed her out of the hospital against medical advice.

In 1984 the family's living conditions deteriorated even further after they moved into a trailer. The conditions, were, in fact, found to be very dangerous by a caseworker, who noticed lighter fluid sitting next to a stove, sharp metal objects near a crib, and cigarette butts everywhere.

In January of 1985, a public health nurse examined the baby and found her to be filthy, pale, and with a bland expression on her face. The child also had a black eye, which the mother claimed to be self-inflicted. The nurse next saw the baby at home and wanted to arrange for a medical appraisal in the health department, but the parents refused to take her for examination. It was finally agreed that a caseworker would bring the mother and children to the department the next morning. R. E. C. was found to have congested lungs, a low hematocrit, small head circumference, poor circulation and underdeveloped muscles, and to be underweight and under height for her age. The mother did not keep a doctor's appointment made for the child by the public health nurse. G. M. C. was also assessed for a nutritional support program and a free iron supplement was prescribed, but the mother did not pick it up. A few days later, when the nurse returned to the trailer, the younger child was still in the same congested condition and wheezing. She was clad only in a diaper on a very cold day. The nurse advised the parents to take her to the emergency room. The record is unclear as to whether they complied.

There was also testimony as to the unsanitary conditions that existed in the home. In August of 1984, when a police detective executed an ex parte order to take R. E. C. into custody, he was so shocked by the family's living conditions that he also took the other child into custody. In September 1984, temporary legal custody of the children was granted to the DFCS. In October the children were again placed with their parents, and by January of 1985 both children were found to be physically, emotionally, and medically neglected. They were returned to foster care after receiving hospital treatment. The children have been in foster care since that time.

The evidence further showed that appellants were evicted from their apartment in July of 1985 for failure to clean it. Thereafter they lived in their automobile while traveling around the southeast, and then stayed in and out of hotels until they separated. Prior to returning to the children's father, the mother lived with her sister, her sister's boyfriend, and their children in a small apartment which social workers also found to be incredibly filthy. The mother claimed that she was babysitting for her sister's children and helping care for

them, but the living conditions became so bad that the department had to provide homemaker services. The mother told a caseworker that she was hiding from her husband because she didn't want him to "find me and start messing with me." The couple resumed living together at his grandmother's residence some eight days prior to the last trial.

The evidence further showed that the parents have contributed nothing to their children's support while they have been in foster care. The father has had no contact with them. The mother visited them regularly before the first trial. She has enrolled in parenting classes but has attended only three classes. The father attended one class a few days before trial. Since they married in 1980, neither of the parents has been employed, and both receive Supplemental Security Income payments which are made to a protective payee. Neither parent knows why they receive these payments and both seem to think it has something to do with "nerves." The mother does some volunteer work sorting clothing in a thrift shop. The evidence also showed the couple to be out of touch with reality. The mother could not recall what she had for lunch that day or even where she had spent the night. She was late for court because she had to wash her hair, and the father claimed that he overslept.

The trial judge found that the couple has consistently failed without justification to comply with court orders designed to promote the proper care and well-being of their children, and to avail themselves of supportive services from DFCS which would assist them in maintaining and providing proper care for the children. They were found to be unfit parents whose children have suffered and would continue, in their custody, to suffer serious physical, mental and emotional harm. The court found that it would be in the best interests of the children to terminate parental rights. *Held*:

In making its ruling, the court below found that the evidence established "by the clear and convincing standard that R. E. C. and G. M. C. are deprived children and that lack of parental care and control by respondents is the cause of such deprivation and that such deprivation is likely to continue or will not be remedied in the future, thereby causing serious physical, mental, emotional and moral harm to the children. There being clear and convincing evidence of parental misconduct or inability, the court further finds from the evidence herein by the clear and convincing standard that termination of parental rights is in the best interest of the children."

The trial court's findings of fact were more than amply supported by the evidence, and the standard for judging parental misconduct as set forth in OCGA § 15-11-81 (a) and (b) was properly applied. R. E. C. and G. M. C. were determined to be deprived by order of the juvenile court on September 25, 1984, and no appeal was taken

from that order. The lack of parental care and control has been apparent for the entire short lives of these children. They have been totally neglected whenever they were placed in their parents' care. The parents have shown little interest in developing parenting skills. Indeed, the father has shown no interest in being a parent, as he had never visited his children since they have been in foster care. The conditions under which these small children were forced to live whenever they were with their parents constituted criminal acts of mental and physical child abuse rather than mere neglect. See *In re L. A.,* 166 Ga. App. 857, 861 (305 SE2d 636) (1983). These parents have also failed to provide any support for their children for the more than three years that they have been in foster care. Both parents have had sufficient time to show that they can care for their children but have failed to do so, and the court was authorized to find that the deprivation and neglect were likely to continue. See *In re L. A.,* supra. Moreover, appellants are not employed, do not have their own home, and are not competent to receive their SSI checks in their own names.

"The trial court had the opportunity to question and observe the parties, and possesses a wide discretion in determining the issues before him, and if the judgment is supported by any evidence and is not clearly erroneous, an appellate court is not authorized to set it aside." *In re H. B. & K. B.,* 174 Ga. App. 435 (330 SE2d 173) (1985). Accordingly, we find that the trial court correctly found that there was present clear and convincing evidence of parental misconduct or inability, as set forth in OCGA § 15-11-81 (a) and (b), and his decision to terminate parental rights will be sustained.

*Judgment affirmed. Carley and Sognier, JJ., concur.*

DECIDED MAY 2, 1988.

*Robert I. Donovan,* for appellants.

*Robert J. Grayson, Michael J. Bowers, Attorney General, Marion O. Gordon, First Assistant Attorney General, Carol A. Cosgrove, Senior Assistant Attorney General,* for appellee.